[Crim. No. 6513.   In Bank.   Nov. 24, 1959.]

## THE PEOPLE, Respondent, v. ROLAND A. SCHAUMLOFFEL, Appellant.

Homer C. Compton, Brock, Fleishman & Rykoff and Robert L. Brock for Appellant.

Edmund G. Brown and Stanley Mosk, Attorneys General, William E. James, Assistant Attorney General, and Norman B. Peek, Deputy Attorney General, for Respondent.

THE COURT.—This cause was transferred to this court after decision by the District Court of Appeal, Second Appellate District, Division Three.  Upon further examination of the record, we adopt the opinion of that court prepared by Mr. Justice Parker Wood, which reads:

Defendant Schaumloffel was accused, in three counts, of the crime of abortion, in violation of section 274 of the Penal Code.  The counts related, respectively, to alleged abortions committed on Rosella Edgar, Betty Watts, and Betty Justsen.  Prior to the trial, count 3 (relating to Justsen) was dismissed on motion of the prosecution.  In a jury trial, defendant Schaumloffel was convicted on counts 1 and 2.  He appeals from the judgment and the order denying his motion for a new trial.

Defendant Crutchfield was also accused in said count 2 with

the crime of abortion, but upon her motion, at the close of the prosecution's case, the court dismissed that count insofar as it pertained to her.

Appellant Schaumloffel, who is a doctor of medicine, contends that the arresting officers illegally searched his office records and illegally seized records and papers belonging to him; that the conviction was based on evidence derived solely from the illegal search and seizure; that the court erred in denying appellant's motion to suppress the evidence based on such search and seizure; and that the court erred in overruling appellant's objections to the admission of that evidence.

Officer Zander testified that in 1952 or 1953 he received information from other police officers that appellant was performing illegal operations; in 1954 he (witness) received similar information from police officers in San Francisco; also in 1954 police officers in Los Angeles told him that a woman at the receiving hospital had told them that appellant had performed an abortion on her; in the latter part of 1956, he (witness) read a newspaper article wherein appellant asserted that someone had attempted to extort money from him by threatening to expose him for performing abortions; he (witness) interviewed John Russo, whom appellant had named as the extortionist, and was told by him that appellant had committed an abortion on Betty Barofsky; Russo also said that Barofsky told him that when she was in appellant's office he wrote, on a card, limited information about her; the card and the writing thereon, as described by her, were similar to certain cards and the writing thereon (later referred to herein) which were taken by the officer from appellant's office; he also talked to Barofsky, who made a statement which was in substance the same as the statement of Russo; he (witness) received information, by telephone from an unknown person, that a woman was coming from Las Vegas to appellant's office to have an illegal abortion performed on her, and that she would arrive at the office about 1 p.m. on January 29, 1957; the officer and three other officers placed the office under surveillance; about 1 p.m. of that day, an automobile arrived at the entrance of the building in which appellant's office was located; a woman got out of the automobile and entered the building, and a man drove the automobile to the rear of the building; the officer (witness) talked to the man, Mr. Thurmond, who said that he brought Mrs. Thurmond to

appellant's office, and that she had made arrangements for appellant to perform an abortion on her; when Mrs. Thurmond came out of the office, she told the officer that appellant had performed an abortion on her; she also said that appellant had written her name and some information on a 5 by 7 card and had placed the card on a shelf near the operating table; then (about 2 p.m.) the four officers entered appellant's office and arrested him for committing abortions illegally; he (witness) searched appellant and the immediate premises; the search related primarily to seeking evidence as to the Thurmond abortion, but he was also seeking evidence regarding Barofsky; he took the following things from the office: a number of deposit slips from the drawer of the desk in the consultation office, loose sheets of paper, loose-leaf alphabetical notebook, and a 1956 diary; none of those things related to Thurmond or Barofsky; he took $600 from appellant's pockets, and he also took from appellant's pocket a small vial containing what appeared to be parts of a fetus; one group of patient records was in a filing cabinet in the nurse's office, and another group of such records was on a shelf by the operating table; he (witness) looked through the regular file of patient records, but he could not recall whether those records were 5 by 7 cards; he looked wherever it was apparent to him that such cards might be found; from the shelf, he took a number of 5 by 7 cards on which there was writing; the cards on the shelf were not in a box or cabinet but were "lying out" in the open; the names on those cards were names of persons unknown to the witness; he did not find a card that referred to Thurmond or Barofsky or Watts; one of the cards which he took from the shelf had the name "Rosella Edgar" on it; he took that card because it was similar to cards which had been described by Thurmond and Barofsky; when he took the Edgar card he anticipated that he would "contact her and see under what circumstances she had been" in appellant's office; he took cards from the shelf because those cards were separated from other cards in the office, and there were names and addresses on them; he wanted "to follow that [Edgar card] up" because it would tend to corroborate the charge against appellant on the Thurmond matter, and it would tend to support a charge against appellant with reference to Edgar; he did not find anything in the office relating to Edgar, other than the card with her name on it; a distinguishing factor of the cards was that names of women were on them; his (witness') experience had been that doctors who perform

abortions do not keep proper records, and sometimes the records are cryptic or they report something "other than what they actually do"; prior to the arrest of appellant, the officer (witness) had no information relating to Edgar, Watts, or Justsen; he did not have a search warrant or a warrant of arrest; over a period of approximately seven years he had made about 100 arrests for the crime of abortion, and in connection therewith he had made searches; he had never obtained a warrant for the searches; as a matter of policy a search warrant is not sought; when he had obtained a search warrant in cases which did not involve abortion, he found "the procedure to be rather time consuming and cumbersome."

As stated in respondent's brief, apparently Officer Zander secured from Edgar the names of Watts and Justsen. Officer Zander testified that indirectly through the Edgar card, which he took from appellant's office, he secured the names of Watts and Justsen.

The Edgar card and the desk diary, which were taken from appellant's office, were offered in evidence by the prosecution, and they were received in evidence. Appellant objected to the offer of said articles on the ground that the search for and the seizure of those articles were illegal. The objection was overruled. Prior to the trial, appellant made a motion to suppress the evidence, which had been seized by the officers, on the ground that the search was illegal. During the trial appellant objected when the seized articles were offered in evidence, and he objected to the evidence which was obtained as a result of such seizure. Those objections, which were made on the ground that the search was illegal, were overruled. During the trial appellant was permitted to have a continuing objection to the offer of evidence which was based on the said search and seizure. The objection was overruled.

By information, filed in April 1957, the defendants herein, Schaumloffel and Crutchfield, were accused of illegally performing abortions on Thurmond and Barofsky. In May 1957 that information was dismissed.

In the trial of the present case, Edgar, Watts, and Justsen were witnesses called by the prosecution. The count as to Justsen (count 3) pertained to an alleged offense occurring about two and a half years before the alleged offense involving Edgar. As above stated, the count relating to Justsen was dismissed before the trial.

Edgar and Watts testified, among other things, that appel-

lant gave them pelvic examinations. It is not necessary to state the details of their testimony. The testimony of each of them was to the effect that appellant illegally performed an abortion on her. The testimony of appellant was to the effect that he did not perform an abortion on either of them. Appellant objected to the testimony of Edgar, Watts, and Justsen on the ground that their names as witnesses in the case were obtained as a result of illegal search and seizure. The objections were overruled.

According to Officer Zander's testimony, the officers entered appellant's office for the purpose of arresting him on a charge of illegally performing an abortion on Mrs. Thurmond; they arrested him on that charge; and they searched him and his office for the purpose of obtaining evidence in connection with that arrest and in connection with the alleged abortion performed on Barofsky. The officers searched all of the doctor's records regarding his patients, and they looked wherever it seemed to them that there might be 5 by 7 cards. It thus appears that they ransacked and looked at all his medical records which were confidential as between the doctor and his patients, and they took many of such records and carried them away from his office. The charge which was made in connection with the original purpose of entering appellant's office (that is, the charge relating to Thurmond) was dismissed. Also, the charge against appellant with respect to Barofsky was dismissed. The Edgar card which the officers carried away from appellant's office was not connected in any way with the charge relating to Thurmond or Barofsky. Prior to the arrest, the officer had no information relating to Edgar, Watts, or Justsen. When the officer took the Edgar card it was his intention to use it in locating Edgar, in interviewing her, and in investigating the circumstances under which she was a patient of appellant. The names of Watts and Justsen were obtained from Edgar, by the officer, as a result of having taken the Edgar card from the office. The Edgar card and the desk diary were placed in evidence by the prosecution. In the diary, under the date of January 24, 1957, there were the words, "Betty Justsen and Edgar, Rosella." Also, in the diary, under the date of January 29, there was the word, "Edgar." Neither the Edgar card, nor the diary, was connected in any way with the specific offense for which the arrest was made, namely, the charge relating to Thurmond. Possession of that card or diary by the doctor was not a public offense or illegal. That card was not contraband or an of-

fending article of any kind. It appears that the search was general and exploratory and resulted in the seizure of confidential records which were not connected with the offense for which the arrest was made.

In *People* v. *Mills*, 148 Cal.App.2d 392 [306 P.2d 1005], the defendant was convicted on 13 counts, including charges of grand theft, violating the Corporate Securities Act, and conspiracy to commit those crimes. A police officer, posing as a prospective investor, agreed to buy certain shares of stock from defendant. The officer knew that defendant did not have a permit to sell the stock. While the officer was in defendant's office (a hotel room) and was completing the purchase of the stock, he arrested the defendant for violating the Corporate Securities Act. Then other officers, who had been waiting outside, entered the room and were directed by the officer (who had purchased the stock) to search the entire office for all things having to do with stock, stock promotion, and other investors. There was no search warrant or any warrant. The entire office was searched by six persons, during a period of approximately 45 minutes. Many documents were seized in the search. The search was directed toward the discovery of evidence of the commission of similar crimes. At the trial therein the prosecution witnesses who testified regarding the 12 counts (other than the count involving the purchase by the officer) were persons whose identity and testimony had been discovered or procured through the seized documents. In that case it was said, at page 399: ''The search was wholly exploratory, a quest for evidence of other crimes. Such a procedure has been condemned repeatedly and for many years.'' It was also said therein, at page 400: ''This condemnation of exploratory searches is fully supported by decisions of the United States Supreme Court and other federal and state tribunals; and the exclusion of illegally seized documents extends to other evidence which is derived from those documents directly or indirectly.'' It was also said therein, at page 401: The search ''may be exercised in aid of discovery of evidence of the particular crime for which the arrest is made.'' On page 402 of that case, it was said: ''Where the bounds of a reasonable search have been exceeded, as here, neither the evidence wrongfully seized nor any of its derivatives may be used against defendant.'' The judgment therein was reversed as to the 12 counts which were based on evidence derived from seizure of documents that were not connected with the crime for which the arrest was made; and the judg-

ment was affirmed as to the count based on the sale to the police officer. The opinion in that case, prepared by Justice Ashburn on behalf of the court, cites and analyzes many cases on the subject of search and seizure.

In the Mills case, just referred to, it was said (p. 403) that *People* v. *Martin*, 382 Ill. 192 [46 N.E.2d 997], "is factually foursquare with the case at bar, and it was held that the witnesses discovered through the wrongfully seized documents could not testify to the other crimes disclosed by those documents." The charge in the Martin case was conspiracy to commit abortion. In the Martin case, the Supreme Court of Illinois said (p. 196) : "There is no manner of question but what the several searches and seizures of papers obtained upon the premises of plaintiff in error, Martin, were illegal and without any pretense of compliance with the law." It was also said in that case (p. 203) that the evidence "was obtained from the matters illegally seized, and this being our conclusion, the evidence should have been suppressed and excluded."

Respondent cites *People* v. *Schmitt*, 155 Cal.App.2d 87 [317 P.2d 673], wherein a chiropractor and another person were convicted of conspiracy to commit grand theft. That case is distinguishable from the present case. When the chiropractor was arrested in his office, the officers had a warrant for his arrest on a misdemeanor charge of false advertising, but they did not have a search warrant. In that case there was a general ransacking of defendant's office, but the question was whether the evidence obtained illegally was used against defendant. It was said therein (p. 103) that the evidence used was obtained in a search that was permissible under the charge for which defendant was arrested. It was also said therein (p. 102) : The "medical records which were received in evidence were connected with the commission of the crime for which he was arrested."

Respondent also cites *United States* v. *Lindenfeld*, 142 F.2d 829, where there was a seizure of patient record cards which were in possession of a physician. Defendant therein was convicted of unlawfully issuing prescriptions of morphine to narcotic addicts. That case is distinguishable from the present case. The defendant therein was required to keep records of the drugs distributed by him. The federal agents seized all of his cards containing the names of patients for whom he had prescribed drugs. It was held therein that the seizure was legal. In that case, the records which were seized were records

which the federal agents were authorized by law to examine. In the present case, the records were not public records but were private and confidential records of the physician.

In the present case the convictions were based upon evidence that was obtained by illegal search and seizure.

In view of the above conclusion, it is not necessary to discuss other contentions on appeal.

The judgment (as to both counts) and the order denying the motion for a new trial are reversed.

SPENCE, J.—I dissent.

The record is replete with evidence to sustain defendant's convictions for the illegal abortions performed on Miss Edgar and Mrs. Watts. The majority nevertheless reverses upon the theory that "the convictions were based upon evidence that was obtained by illegal search and seizure." I cannot agree.

Although the defendant has not contended that he was arrested without reasonable cause, the question of the reasonableness of the search and seizure as an incident to the arrest was raised at the outset of the trial. On this question, the prosecution then introduced abundant evidence from which the trial court properly concluded that the officers had made a reasonable search in good faith for five by seven cards which, as they had been informed, were used in connection with the Thurmond and Barofsky abortions. No Thurmond or Barofsky cards were found, but the officers seized some five by seven cards which were on an open shelf next to the operating table. They also seized the desk calendar, which apparently was likewise in plain view. Among the seized cards was the Edgar card, and among the entries in the desk calendar was the Edgar entry. These were the only seized documents which were admitted in evidence.

In my opinion, the record does not bear out the statement of the majority that "[t]he officers searched all of the doctor's records regarding his patients," or the statement that "they ransacked and looked at all his medical records. . . ." The majority correctly states that the evidence shows that the officers "looked wherever it seemed to them that there might be five by seven cards," but the trial court was justified in concluding that this was reasonable in the light of the officers' information concerning the Thurmond, Barofsky and other abortions and concerning the purpose for which the five by seven cards were used.

Defendant stresses the fact that the arrest was made primarily because of the officers' information concerning the Thurmond and Barofsky abortions, and that the evidence obtained during the search was used in a prosecution involving only the Edgar and Watts abortions. But ". . . in the course of conducting a reasonable search they [the officers] did not have to blind themselves to what was in plain sight simply because it was disconnected with the purpose for which they entered." (*People* v. *Roberts,* 47 Cal.2d 374, 379 [303 P.2d 721].) And as was said in *United States* v. *Abel,* 258 F.2d 485 at page 497, "in a case such as the present one, where the trial court properly has been convinced that the motivation for the search is the hope of obtaining evidence of the offense for which the arrest is being made, the constitutional prohibition against unreasonable searches is not transgressed; and hence, when, during such a permissible search, articles . . . that were not searched for are in fact discovered no useful purpose would be served by prohibiting seizure of them if they tend to prove the commission of a crime even though the crime be unrelated to the crime for which the arrest is being made." Furthermore, the Edgar card was not evidence "disconnected with" or "unrelated to" the Thurmond and Barofsky abortions, since evidence found by the officers relating to similar abortions would be admissible in a prosecution for any one of such offenses. (*People* v. *Gallardo,* 41 Cal.2d 57 [257 P.2d 29] ; *People* v. *Coltrin,* 5 Cal.2d 649 [55 P.2d 1161] ; *People* v. *Ames,* 151 Cal.App.2d 714 [312 P.2d 1111] ; *People* v. *Green,* 111 Cal.App.2d 794 [245 P.2d 526].)

As I read the majority opinion, it does not question the propriety of defendant's arrest without a warrant or the reasonableness of the search and seizure from the person of the defendant, of the large amount of currency and of the vial containing placental tissue. My views therefore differ from those of the majority only in that I believe the trial court properly concluded that the search for, and seizure of, the five by seven cards and desk calendar was reasonable under the circumstances and violated no constitutional right of the defendant. Even assuming, solely for the purpose of this discussion, that the officers may have engaged in some searching activity in defendant's offices which could be said to have been unreasonable, this should not affect the admissibility of the cards and calendar because they were produced solely as the result of reasonable searching activity. (*People* v.

*Schmitt,* 155 Cal.App.2d 87, 102-103 [317 P.2d 673].) I therefore conclude that the cards and calendar were properly admitted in evidence; and that the testimony of Miss Edgar and Mrs. Watts, whose names were obtained therefrom, was likewise properly admitted.

From a reading of the record in the light of defendant's several contentions, I am convinced that he was accorded a fair trial free from any prejudicial error.

I would therefore affirm the judgment and the order denying the motion for a new trial.