[Crim. No. 16391.  Second Dist., Div. Five.  Mar. 6, 1970.]

THE PEOPLE, Plaintiff and Respondent, v.
WILLIAM ARTHUR DEMORAY, Defendant and Appellant.

**COUNSEL**

Milton Orman, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, George J. Roth and Thomas Kallay, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**KAUS, P.J.**—By information defendant was charged with two counts of forgery. Count I accused him of passing a forged check in the sum of $21.64 at an Alpha Beta Market on June 25, 1968.[1] Count II related to a forged check in the sum of $23.50, also passed at an Alpha Beta Market, on June 29, 1968. After an unsuccessful motion to suppress, defendant pleaded guilty to count I. Count II was dismissed. Defendant was then placed on three years summary probation, conditioned on his spending ten months in the county jail. He appeals.

---

[1] The evidence at the preliminary hearing clearly showed that the correct year on both counts I and II was 1967.

The only issue before us is the propriety of the superior court's refusal to grant the motion to suppress. In order to understand the problem a very brief summary of the testimony at defendant's preliminary hearing is essential.

The first check (count I) was accepted by a Mr. Barney on June 25, 1967. Although he identified defendant as the person who cashed the instrument, he "wouldn't stake [his] life on it." The second check (count II) was accepted by a Mr. Zimmerman. He was unable to identify defendant as the person who passed it. Both checks bore the purported signature of Fred R. King. Each was apparently passed in the Long Beach area.

Mr. King identified the forged checks as having been written on his "personalized" blanks. He denied having given anyone permission to sign his name.

Officer Brown of the Long Beach Police Department identified a document which had been in the possession of that department since May 7, 1966, as having been written by defendant in the officer's presence, while defendant was in jail on some unrelated charge. We shall call this document the "1966 exemplar."

It was then stipulated that a qualified handwriting expert would testify that he had compared the handwriting on the two checks with that on the 1966 exemplar and that all three documents were written by the same person.

It will be noted that without the expert's testimony the People had no case on count II and a rather weak one on count I.

The only witness who testified at the motion to suppress were defendant and a Mrs. Cross, his "common law" wife. Before any evidence was taken it was stipulated that the handwriting comparison to which there had been the stipulation at the preliminary hearing, was made after defendant's arrest in Sparks, Nevada, in late May or early June, 1968, nearly a year after the two forged checks were passed. The comparison was made "pursuant to a telephone call" from the Sparks authorities to the Long Beach police.

Defendant then testified to the circumstances of the Sparks arrest: his story was as follows: Driving an automobile which he had purchased for $15 from someone who had lost all of his money in Las Vegas and wanted just enough cash to get to Long Beach, defendant drove into a gas station at Sparks at about 2:30 in the morning. The previous owner of the car had left "clothes and things of that nature" and some boxes in the trunk of the car. Mrs. Cross and one male passenger were sitting in the front seat, another male passenger was in the back seat. The station attendant was asleep. The front seat passenger left the car and took a water jug into the

restroom to fill it with water. After he returned defendant started to drive away, when suddenly he was 'stopped by two "cop cars" who came "out of nowhere." The officers then accused the rear seat passenger of having stolen several cans of oil while the other passenger was getting water. To defendant's surprise, there really were several cans of oil on the back seat of the car. The officers then searched the trunk without permission. They found a wallet which defendant denied was his. There were several identification cards in the wallet, but defendant was unable to recall whose name they bore. The officers did not find any blank checks in the trunk. At the time of the Sparks incident defendant was not in possession of blank checks bearing the name of Fred R. King. Defendant was arrested for petty theft, as apparently was the right rear passenger. The record is not clear on whether Mrs. Cross or the other passenger were held.

Mrs. Cross corroborated defendant's testimony, except that according to her the officers took something from the car which looked "like a pass book or a check book or something like that." When they confronted defendant with it he said that he had never seen it before.

After this testimony was received defense counsel was somewhat embarrassed at being unable to specify just exactly what he wanted the court to suppress. What he had hoped to develop is, of course, perfectly plain: that the search of the trunk was illegal, that it produced something which caused the Sparks authorities to get in touch with the Long Beach police, who then, for the first time, thought of having an expert compare the forged checks passed in 1967—which they had apparently never attributed to defendant—with the 1966 exemplar. Thereby the authorities not only fastened on defendant as the person who had passed the checks, but obtained expert testimony which, at a trial, would have been vital as to one count and reasonably so as to the other.

If there were any evidence in the record that, for example, the search of the trunk revealed check blanks with Mr. King's name printed on them, defendant would have a point. Since the police officers evidently watched the theft being committed from front row, center, they knew that the trunk could not possibly contain either the fruits of the crime or any evidence relating thereto; nor does it appear that they needed to search for weapons in order to protect themselves.[2] If the search was illegal, it tainted any

---

[2]The trial court ruled that the search of the trunk was legal simply because it was contemporaneous with the arrest. We have not found a case involving a search of an automobile trunk after an arrest for a crime which the arresting officers actually observed, where the arrestees were safely in custody or detained preliminary thereto and where neither the fruits of the crime nor any evidence relating thereto could possibly be in the trunk. It is of course conceivable that the officers chanced upon the scene after defendant's passenger had already started to steal oil cans and that they had reason to suspect that he may have put some into the trunk before they

leads it developed. (*People* v. *Schaumloffel,* 53 Cal.2d 96 [346 P.2d 393]; *Yonchar* v. *Superior Court,* 193 Cal.App.2d 135, 137 [14 Cal.Rptr. 93].)

Yet even if we agree, for the sake of discussion, that the search of the trunk was illegal, this leads us nowhere. Employing the customary metaphor, defendant has a poisonous tree, but only speculation whether the information conveyed by the Sparks officers to the Long Beach police, was its fruit. The problem is therefore not one of "unpoisoning the fruit" (Maguire, *How To Unpoison The Fruit—The Fourth Amendment And The Exclusionary Rule* (1964) 55 J.Crim.L., C. & P.S. 307, 317-318; cf. *People* v. *Sesslin,* 68 Cal.2d 418, 428 [67 Cal.Rptr. 409, 439 P.2d 321]; *People* v. *Bilderbach,* 62 Cal.2d 757, 766-767 [44 Cal.Rptr. 313, 401 P.2d 921])—a process in which the People carry the burden of persuasion—but of proving the "primary taint" (*Wong Sun* v. *United States,* 371 U.S. 471, 487-488 [9 L.Ed.2d 441, 455-456, 83 S.Ct. 407].)

■ Although the ultimate burden of persuasion that, in spite of the People's acquisition of tainted leads or evidence, the evidence presented to the trier of fact is untainted is with the People, the initial burden of going forward with some evidence that illegal police conduct led to tainted derivative evidence, is with the accused. (*Alderman* v. *United States,* 394 U.S. 165, 183 [22 L.Ed.2d 176, 192, 89 S.Ct. 961].) ". . . The burden is, of course, on the accused in the first instance to prove to the trial court's satisfaction that wire-tapping was unlawfully employed. Once that is established—as was plainly done here—the trial judge must give opportunity, however closely confined, to the accused to prove that a substantial portion of the case against him was a fruit of the poisonous tree. This leaves ample opportunity to the Government to convince the trial court that its proof had an independent origin." (*Nardone* v. *United States,* 308 U.S. 338, 341 [84 L.Ed. 307 at p. 311, 60 S.Ct. 266].)

■ We believe that defendant proved nothing except an arguably illegal search. His own testimony was to the effect that whatever the officers found in the trunk belonged to the previous owner of the car. Defendant even denied that any blank checks were found or that any such checks were in his possession. Neither in the trial court nor here has defendant ever attempted to show how anything identifying the previous owner of the car could have led to the Long Beach police getting the idea that their 1966 prisoner could be the person who had passed two forged checks in 1967. It may well be that defendant is the victim of his own mendacity, that there was no previous owner as testified to by him and that the police did find

arrived. Unfortunately the trial court's ruling was not placed on such a narrow ground. It seems inconsistent with *Virgil* v. *Superior Court,* 268 Cal.App.2d 127, 132 [73 Cal.Rptr. 793].

check blanks identifying their owner as King. If that had been the case the conclusion that the telephone call to the Long Beach police suggested that if they knew of any forged checks bearing King's name, the person who had passed them might be a William Arthur Demoray, is almost irresistible; however nothing of the sort was proved. It is just as likely that some clue legitimately found on defendant's person caused the contact with the Long Beach police. Nor does Mrs. Cross' testimony that the officers took an object which looked "like a pass book or check book or something like that" rise to the level of substantial evidence that it was the object which caused the Sparks police to get in touch with Long Beach.

The judgment (order granting probation) is affirmed.

Stephens, J., and Reppy, J., concurred.