[Crim. No. 2422. Fifth Dist. Feb. 28, 1977.]

THE PEOPLE, Plaintiff and Respondent, v.
STUART SPENCE SMITH, JR., Defendant and Appellant.

[Crim. No. 2440. Fifth Dist. Feb. 28, 1977.]

THE PEOPLE, Plaintiff and Respondent, v.
PATRICK O'NEILL, Defendant and Appellant.

THE PEOPLE, Plaintiff and Respondent, v.
HUBBARD WILLIAM SHAWHAN, JR., Defendant and Appellant.

## COUNSEL

Nielsen, Hales & Hayden, Leon L. Anderson, Rose & Dettmer, Ronald W. Rose, Thomas H. Dettmer, Michael Stepanian and Rommel Bondoc for Defendants and Appellants.

Charles C. Marson, Margaret C. Crosby, Alan L. Schlosser and Donald Glasrud as Amici Curiae on behalf of Defendants and Appellants.

Evelle J. Younger, Attorney General, Jack W. Winkler, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Robert D. Marshall and Paul V. Bishop, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**GARGANO, J.**—In February 1975 the Grand Jury of Tuolumne County returned indictments in the superior court of that county charging appellants Stuart Smith, Patrick O'Neill and Hubbard Shawhan with a conspiracy to transport marijuana and to possess marijuana for sale (Pen. Code, § 182, subd. 1; Health & Saf. Code, §§ 11359, 11360). In addition, Smith and O'Neill were charged with transporting marijuana and with possession of the contraband for sale; Shawhan was charged with attempting to transport marijuana and with possession of the contraband for sale. Thereafter each man entered pleas of not guilty to all charges and moved to suppress evidence pursuant to section 1538.5 of the Penal Code; their motions were denied. Thereupon, Hubbard Shawhan entered a plea of guilty to the count charging him with an attempt to transport marijuana; the remaining charges against him were dismissed, the execution of sentence was suspended, and he was admitted to probation for a term of five years on condition that he serve one year in the county jail; the imprisonment condition was stayed pending Shawhan's service of 18 months in a federal prison on another offense. Stuart Smith and Patrick O'Neill entered pleas of guilty to conspiracy, and the other charges against them were dismissed; as to each man the court suspended the imposition of sentence and granted probation on condition that they serve one year in the county jail.

██ Appellants have appealed claiming that the evidence upon which the grand jury indictments were grounded was the product

of an unlawful search and seizure. (Pen. Code, § 1538.5, subd. (m); *People* v. *Hill* (1974) 12 Cal.3d 731, 739, fn. 2 [117 Cal.Rptr. 393, 528 P.2d 1].)[1] Briefly, they maintain that the marijuana evidence involved in their convictions was gathered by the police through the use of a transponder which was installed in an airplane that had been rented by appellant Smith, and that the installation constituted a search within the ambit of the Fourth Amendment of the United States Constitution. Appellants assert that their Fourth Amendment rights were violated because the search was made without Smith's knowledge or consent, without probable cause, without a warrant and without exigent circumstances.

We recite the facts in detail.

On Monday, January 20, 1975, a caller telephoned the Police Department of the City of San Jose in Santa Clara County and informed Officer Robert Jones that a Stuart Smith and a Patrick O'Neill were going to fly an airplane to Mexico to pick up a large load of marijuana; the caller stated that the men were going to transport the contraband back to the United States and were planning to land the airplane somewhere in the Santa Cruz Mountains. Officer Jones took the caller's name, address and telephone number. He also asked the informant several questions; the answers to these inquiries satisfied Jones that the caller, who was not a regular police informant, was not involved in the criminal activity he was reporting.

About half an hour later the informant called back and told Officer Jones that the aircraft that Stuart Smith was going to fly to Mexico was a Cessna and that Smith was in the local area already and in the process of

---

[1]Appellant Shawhan properly appeals from the judgment rendered against him, and appellant Smith properly appeals from the order granting him probation. (See Pen. Code, § 1237, subd. 1; *People* v. *Cook* (1975) 13 Cal.3d 663, 666-667, fn. 1 [119 Cal.Rptr. 500, 532 P.2d 148]; *People* v. *Arguello* (1963) 59 Cal.2d 475, 476 [30 Cal.Rptr. 333, 381 P.2d 5]; *People* v. *Robinson* (1954) 43 Cal.2d 143, 145 [271 P.2d 872]; *In re Phillips* (1941) 17 Cal.2d 55, 58 [109 P.2d 344, 132 A.L.R. 644].) Appellant O'Neill, however, purports to appeal from a "judgment;" in accordance with standard practice we will treat his appeal as having been taken from the order granting him probation. (See *People* v. *Cook, supra,* 13 Cal.3d 663, 666-667, fn. 1, 673.)

Appellant Smith, in addition, purports to appeal from the order denying his section 1538.5 motion to suppress evidence; such an order is nonappealable, and the attempted appeal therefrom must be dismissed. (*People* v. *Jochen* (1975) 46 Cal.App.3d 243, 245, fn. 1 [119 Cal.Rptr. 914].) Lastly, the record reflects that appellant O'Neill has filed two notices of appeal from the "judgment;" his second appeal from the "judgment," taken on August 7, 1975, will be dismissed as being superfluous.

renting the airplane from an aircraft agency; he said the airplane would be leaving for Mexico that day. Thereupon, Officer Jones ultimately contacted a firm known as Aero Trends, Incorporated, and talked to the owner, Bud Terry; Terry told the officer that Stuart Smith was a member of a flying club operated by Aero Trends and that Smith just had taken off in a rented Cessna airplane owned by the firm; Terry gave the officer the serial and identification numbers of the aircraft. Officer Jones then called the Departure Control Center operated by the Federal Aviation Administration in the San Francisco Bay area, and he ultimately concluded that the Cessna had landed at Watsonville in Santa Cruz County. The officer next called the Drug Enforcement Administration in San Francisco and requested assistance; he was told that he would be contacted by Agent Michael Leonard.

At about 10 p.m. that evening Agent Leonard telephoned Officer Jones from San Francisco. He informed Jones that an electrical device known as a "transponder" was available and that it could be installed in the suspect aircraft to keep it under surveillance at all times during flight; Leonard explained that the "transponder" he had was a piece of electrical equipment that generated a special, coded signal which appeared on a radar screen as a "blip" distinctly different from ordinary radar "blips." Jones indicated that he wanted the tracking equipment placed into the aircraft if time permitted. Leonard replied that he would drive to Watsonville with the transponder and that he would arrive at about 1 a.m.

Following his conversation with Agent Leonard, Jones telephoned Bud Terry and informed him that the Cessna was in Watsonville. He told Terry that he believed that the airplane was enroute to Mexico to pick up marijuana and that he was going to try to install a "transponder" on the aircraft if it was still in Watsonville. Terry agreed to cooperate; he said that he and his mechanic would install the transponder in the aircraft for the police if he received assurance that the Mexican government would not impound the aircraft when it landed in that country.

At about 11:30 p.m., Officer Jones, Bud Terry and Terry's mechanic flew to Watsonville, arriving at the airport around midnight; they soon located the rented Cessna in the "short-term parking area" of the airport. Jones walked up to the airplane and looked inside; he noticed that the rear seats had been removed.

At around 1 a.m., Agent Leonard and Agent Dennis Petrotta of the Drug Enforcement Administration arrived at the Watsonville Airport with the transponder. When Agent Leonard assured Bud Terry that the Mexican government would not seize the Cessna, Terry unlocked the airplane's door with his key; Terry entered the aircraft and with the assistance of the mechanic installed the transponder behind the dashboard in the cockpit. Afterward, Terry flew the airplane around for 10 to 15 minutes to make certain that the equipment was working properly; when he landed, the time was around 2:30 a.m. Jones, Bud Terry and the mechanic then flew back to San Jose while Agents Leonard and Petrotta stayed at the airport to maintain visual surveillance over the aircraft.

On Tuesday, January 21 at 12:30 p.m., Stuart Smith and Patrick O'Neill drove into the Watsonville Airport in an automobile and got into the Cessna; the airplane took off with Smith at the controls. It subsequently landed at Gillespie Field near the City of San Diego. In the meanwhile, Agents Leonard and Petrotta notified agents of the Drug Enforcement Administration in Southern California of the aircraft's departure. As a consequence, when the Cessna landed at Gillespie Field, agents of the Drug Enforcement Administration and officers of the United States Customs Service took up the visual surveillance.

On the following day, at about 1:50 p.m., Smith and O'Neill left Gillespie Field in the Cessna and headed toward the City of Brawley in Imperial County. They were followed by two other airplanes; one was occupied by Agents Maxie Jarrel and Jim Plavin of the Drug Enforcement Administration, and the other by Officers Richard McMakin and Gene Gantert of the United States Customs Service. When the Cessna landed at Brawley Airport, the other airplanes remained aloft; from law enforcement officers on the ground, the officers flying in the airplanes above learned that the suspects were inquiring about Calexico, a city in Imperial County located just north of the border between the United States and Mexico. About 15 minutes after they landed Smith and O'Neill got back into the Cessna and flew it south to the City of Calexico; the police airplanes followed.

At Calexico, the Cessna landed at the airport and Smith and O'Neill went into the city. Then the airplane occupied by Agents Jarrel and Plavin also landed and refueled; when it took off again, the aircraft manned by United States Customs Service Officers McMakin and Gantert landed at the airport. McMakin walked up to the Cessna and

looked inside; he saw that the rear seats had been removed and that the rear cargo area was empty; he also noted that there were no curtains on the windows of the Cessna. Later, at about 5 p.m., Smith and O'Neill returned to the airport, got into the Cessna and flew it back to Brawley Airport.

After following the Cessna back to Brawley, the agents of the Drug Enforcement Administration decided to return to Brawley Airport at 5 a.m. the following day to take up surveillance from the ground; the United States Customs Service officers agreed to join the surveillance from the air at 6 a.m. However, when the agents returned to Brawley Airport on the next day as scheduled, they discovered that the Cessna had left the airport; visual surveillance of the Cessna was abandoned.

At about 9 a.m. that same day, the San Diego Approach Control Tower picked up on its radar screen the signal from the transponder that had been placed in the Cessna; the United States Customs Service immediately was notified that the suspect airplane was approximately 18 miles southeast of the City of Julian in San Diego County and was flying in a northwesterly direction. Approximately one-half hour later, Officers Richard McMakin, Gene Gantert and Jack Arsvold, in a United States Customs Service aircraft, made visual contact with the Cessna about 12 miles southeast of the City of Agua Dulce in Los Angeles County. The Cessna made a brief stop at Agua Dulce, took off and headed toward the San Joaquin Valley; it landed at Columbia Airport in Tuolumne County. The government airplane also landed at the airport.

At Columbia Airport, Smith and O'Neill met Hubbard Shawhan and the three men drove to the City of Sonora in a pickup truck. The customs service officers contacted agents of the Drug Enforcement Administration in the City of Stockton, who in turn called the Tuolumne County Sheriff's Department. Then Officer Richard McMakin walked over to the Cessna and observed that it appeared to be carrying a heavy load. He also observed that the windows toward the rear of the airplane were "covered or blacked out." The officer looked into the aircraft through one of the front windows and saw numerous large bale-like packages wrapped in green trash-bag liners tied with white strings.

At about 5 p.m. Stuart Smith and Hubbard Shawhan returned to the rented Cessna and prepared to take off. Before they could do so the two men were placed under arrest by the United States Customs Service

officers and by officers from the Tuolumne County Sheriff's Department who had arrived at the scene. In the Cessna the officers found 8 large green bags, each containing 36 bricks of high-grade bulk marijuana, and 1 small brown bag containing 12 bricks of high-grade bulk marijuana.

Preliminarily, the Attorney General suggests that no violation of Fourth Amendment rights occurred in this case even if we were to assume that the installation of the transponder amounted to a search; he argues that the search was consensual because it was made with the consent of Bud Terry, the owner of the airplane. Apparently, he also invokes the "good faith mistake" rule to uphold the search irrespective of Terry's authority to enter the airplane; under this rule a search is not unreasonable if made with the consent of a third party whom the police reasonably and in good faith believe has authority to consent to the search. (*People* v. *Carr* (1972) 8 Cal.3d 287, 298 [104 Cal.Rptr. 705, 502 P.2d 513]; *People* v. *McGrew* (1969) 1 Cal.3d 404, 412 [82 Cal.Rptr. 473, 462 P.2d 1], overruled on other grounds in *People* v. *McKinnon* (1972) 7 Cal.3d 899 [103 Cal.Rptr. 897, 500 P.2d 1097]; *People* v. *Hill* (1968) 69 Cal.2d 550, 554 [72 Cal.Rptr. 641, 446 P.2d 521], affd. 401 U.S. 797 [28 L.Ed.2d 484, 91 S.Ct. 1106].)

■ We are not impressed by these arguments. While the owner of the Cessna unlocked the aircraft and installed the transponder for the police, the fact remains that the airplane was rented to Stuart Smith, a member of Bud Terry's flying club. Thus, the Cessna was under the possession and control of Smith when the tracking equipment was installed and this possession and control never was terminated by Terry, either before or after the entry was made. Clearly, Terry did not have the authority to install the transponder into the airplane for the police. (See *Stoner* v. *California* (1964) 376 U.S. 483, 489-490 [11 L.Ed.2d 856, 860-861, 84 S.Ct. 889, 893]; *Chapman* v. *United States* (1961) 365 U.S. 610, 616-617 [5 L.Ed.2d 828, 833-834, 81 S.Ct. 776, 779-780]; *United States* v. *Kelly* (W.D.Mo. 1976) 414 F.Supp. 1131, 1146; *Krauss* v. *Superior Court* (1971) 5 Cal.3d 418, 422 [96 Cal.Rptr. 455, 487 P.2d 1023]; *People* v. *Baker* (1970) 12 Cal.App.3d 826, 836 [96 Cal.Rptr. 760]; see also *United States* v. *Matlock* (1974) 415 U.S. 164, 171, fn. 7 [39 L.Ed.2d 242, 250, 94 S.Ct. 988, 993].) ■ Moreover, because Officer Jones was aware of the rental arrangement between Terry and Smith, the "good faith mistake" rule does not apply. (*Stoner* v. *California, supra,* 376 U.S. 483, 488-489 [11 L.Ed.2d 856, 860-861, 84 S.Ct. 889, 892-893]; *Krauss* v. *Superior Court, supra,* 5 Cal.3d 418, 422; *People* v. *McGrew, supra,* 1

Cal.3d 404, 413; see *People* v. *Superior Court (York)* (1970) 3 Cal.App.3d 648, 657 [83 Cal.Rptr. 732].) In fact, at one point in his testimony Jones stated that he did not rely upon the owner's permission and that he took Terry with him so that the police would not have to break open the door to the airplane.

■ Neither are we persuaded by the Attorney General's argument that there were exigent circumstances to justify the warrantless installation of the transponder assuming that the police had probable cause to do so. (See *Katz* v. *United States* (1967) 389 U.S. 347, 357-359 [19 L.Ed.2d 576, 585-587, 88 S.Ct. 507, 514-515].) Officer Jones testified that he made up his mind to install the transponder as soon as he talked to Agent Leonard at about 10 p.m. on the evening of January 20, 1975; but Leonard told the officer that it would take at least three hours to transport the transponder from San Francisco to the airport at Watsonville. Yet, insofar as this record shows, during the almost two-hour period that elapsed before Jones and Bud Terry took off for Watsonville, the officer made no attempt whatever to obtain a warrant authorizing the installation of the transponder; he testified, in essence, that the thought of getting a warrant never occurred to him, and that if had he would have dismissed the idea because he did not believe he had the time to do so. (See *Chapman* v. *United States, supra,* 365 U.S. 610, 615 [5 L.Ed.2d 828, 832, 81 S.Ct. 776, 779]; *Johnson* v. *United States* (1948) 333 U.S. 10, 15 [92 L.Ed. 436, 441, 68 S.Ct. 367, 369].) Furthermore, Jones, Bud Terry and Terry's mechanic arrived at the Watsonville Airport around midnight and immediately located the Cessna in the "short-term parking area;" it was then that Jones walked up to the airplane and noticed that the rear seats were missing. Once again, he did not try to get a telephonic warrant although he knew that he had almost an hour to wait before the transponder arrived. (See Pen. Code, §§ 1526, subd. (b), 1528, subd. (b); see generally *Sternberg* v. *Superior Court* (1974) 41 Cal.App.3d 281, 285-290 [115 Cal.Rptr. 893]; *People* v. *Peck* (1974) 38 Cal.App.3d 993, 998-1000 [113 Cal.Rptr. 806]; *Bowyer* v. *Superior Court* (1974) 37 Cal.App.3d 151, 161-164 [111 Cal.Rptr. 628, 112 Cal.Rptr. 266].) Finally, the installation of the transponder was not completed until around 2:30 a.m. and by then it must have been very apparent to the officers that the suspects were not going to return to the airplane at least for several more hours; Mr. Terry even tested the transponder by flying the aircraft for about 10 to 15 minutes. Nevertheless, the officers made no attempt to get postinstallation court approval for the attachment of the transponder despite the fact that they planned to use the tracking device over a

prolonged period. (Cf. ABA Project on Standards for Criminal Justice, Stds. Relating to Electronic Surveillance (Approved Draft 1971) std. 5.2, subd. (iii).)

█ It is the state's burden to justify a warrantless search and if the installation of the transponder is deemed a search within the ambit of the Fourth Amendment, the state did not meet its burden in this case. (*People* v. *Hill, supra,* 12 Cal.3d 731, 747; *Badillo* v. *Superior Court* (1956) 46 Cal.2d 269, 272 [294 P.2d 23].) On the contrary, although Officer Jones' testimony at times was equivocal and contradictory, it is reasonably apparent that he did not try to get a warrant because he did not believe that one was necessary to install electronic tracking equipment; his observation at the suppression hearing that he did not have time to get one was hindsight, nothing more. (See *Mestas* v. *Superior Court* (1972) 7 Cal.3d 537, 542 [102 Cal.Rptr. 729, 498 P.2d 977]; *People* v. *Superior Court (Simon)* (1972) 7 Cal.3d 186, 198 [101 Cal.Rptr. 837, 496 P.2d 1205].) In addition, even if we were to assume that the officer's failure to get a warrant was due to an actual belief that he did not have time to do so, the People presented no evidence to show that his subjective belief was reasonable. █ It is fundamental that in assessing probable cause to arrest without a warrant, an officer's subjective beliefs must be measured by objective standards (*People* v. *Miller* (1972) 7 Cal.3d 219, 226 [101 Cal.Rptr. 860, 496 P.2d 1228]); obviously the same test should apply to warrantless searches.

While we do not reach the issue of probable cause we make these observations. First, no evidence was presented by the People to show that the informant who called Officer Jones on the afternoon of January 20, 1975, spoke with personal knowledge or gained his information in some other reliable way. (*People* v. *Johnson* (1970) 13 Cal.App.3d 742, 748-749 [92 Cal.Rptr. 105]; *People* v. *Castaneda* (1969) 1 Cal.App.3d 477, 481-482 [82 Cal.Rptr. 205]; see *People* v. *Hamilton* (1969) 71 Cal.2d 176, 179-181 [77 Cal.Rptr. 785, 454 P.2d 681]; *People* v. *Aguirre* (1970) 10 Cal.App.3d 884, 889-891 [89 Cal.Rptr. 384].) Second, there was no evidence or other factual circumstances to show that the informant was of proven reliability (*People* v. *Johnson* (1968) 68 Cal.2d 629, 634 [68 Cal.Rptr. 441, 440 P.2d 921]; see *People* v. *Scoma* (1969) 71 Cal.2d 332, 337-340 [78 Cal.Rptr. 491, 455 P.2d 419]), or a citizen informant (*People* v. *Smith* (1976) 17 Cal.3d 845, 850-852 [132 Cal.Rptr. 397, 553 P.2d 557]; *People* v. *Ramey* (1976) 16 Cal.3d 263, 268-269 [127 Cal.Rptr. 629, 545 P.2d 1333]); when Jones was asked to explain how he knew that the informant was

reliable, he merely answered that he took the informant's name, address and telephone number, that he determined that the caller was not a regular police informant and that he asked the caller several questions and concluded from the answers that he was not involved in the criminal activity he was reporting; then the officer refused to disclose the informant's identity or the nature of the questions he asked, claiming that if he did so the defense would learn the informant's name. Third, albeit Officer Jones noticed that the rear seats had been removed from the Cessna when he viewed the aircraft at Watsonville Airport, no evidence was presented to show that the officer had been told that the rear seats were in the Cessna at the time appellant Smith took possession of the airplane.[2] (See generally *People* v. *Benjamin* (1969) 71 Cal.2d 296, 301-303 [78 Cal.Rptr. 510, 455 P.2d 438]; *People* v. *Flores* (1968) 68 Cal.2d 563, 566 [68 Cal.Rptr. 161, 440 P.2d 233]; *Willson* v. *Superior Court* (1956) 46 Cal.2d 291, 294-295 [294 P.2d 36].)

We turn to the Attorney General's remaining arguments in defense of the trial court's order denying the motions to suppress.

Grasping upon the proposition that the Fourth Amendment does not protect an individual from every police trespass or intrusion, the Attorney General argues that appellants' constitutional rights were not violated in this case because at the time the transponder was being installed, the officers were not looking for or seeking out evidence concealed within the airplane. He asserts that "traditionally" a search requires " 'prying into hidden places for that which is concealed' " or " 'viewing . . . that which [is] . . . intended to be private.' " (*People* v. *Superior Court (Mata)* (1970) 3 Cal.App.3d 636, 639 [84 Cal.Rptr. 81]; *People* v. *Superior Court (Aslan)* (1969) 2 Cal.App.3d 131, 134 [82 Cal.Rptr. 507].)

█ We agree with the premise that the Fourth Amendment does not protect the individual from every police trespass or intrusion. (See *People* v. *Edwards* (1969) 71 Cal.2d 1096, 1104 [80 Cal.Rptr. 633, 458 P.2d 713]; *People* v. *Terry* (1969) 70 Cal.2d 410, 427 [77 Cal.Rptr. 460, 454 P.2d 36].)

---

[2]The Attorney General states that the informant told Officer Jones that Smith and O'Neill, after renting the aircraft, were planning to remove the rear seats in order to accommodate a large cargo of marijuana. We have carefully reviewed the record and have found no support for this statement. While a friend of appellants testified at the grand jury proceeding that the rear seats of the Cessna were removed in Watsonville and stored in his house, there is nothing in the record showing that Officer Jones, or any other law enforcement officer, was aware of this information at the time the transponder was installed into the airplane.

We do not agree, however, with the assumption that a search takes place only when the police are " 'prying into hidden places for that which is concealed' " or " 'viewing . . . that which [is] . . . intended to be private.' " A search also can occur when police authorities violate one's reasonable expectation of privacy while engaging in an activity designed to gather evidence and instrumentalities of crime. In short, a search within the tenor of the Fourth Amendment occurs whenever the police intrude upon one's reasonable expectation of privacy and the intrusion, as here, is for the purpose of facilitating the discovery and gathering of incriminating evidence whether the contemplated discovery or gathering is immediate or not. As explained in *United States* v. *Hufford* (9th Cir. 1976) 539 F.2d 32, 33 (cert. den., 429 U.S. 1002 [50 L.Ed.2d 614, 97 S.Ct. 533]), the installation of a tracking device is ". . . a probing, exploratory quest for evidence, . . ."

■ To recapitulate, we agree with the Attorney General's position that the Fourth Amendment ". . . cannot be translated into a general constitutional 'right to privacy.' " (*Katz* v. *United States* (1967) *supra,* 389 U.S. 347, 350 [19 L.Ed.2d 576, 581, 88 S.Ct. 507, 510].) Nevertheless, the basic purpose of the amendment ". . . is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." (*Camara* v. *Municipal Court* (1967) 387 U.S. 523, 528 [18 L.Ed.2d 930, 935, 87 S.Ct. 1727, 1730]; see *Terry* v. *Ohio* (1968) 392 U.S. 1, 18, fn. 15 [20 L.Ed.2d 889, 903-904, 88 S.Ct. 1868, 1878].) Accordingly, the Fourth Amendment is applicable when the police make a thorough investigation into the private property of an individual even though they are not searching for the express purpose of finding evidence of crime. (*Mozzetti* v. *Superior Court* (1971) 4 Cal.3d 699, 706 [94 Cal.Rptr. 412, 484 P.2d 84].) Succinctly stated, a search within the meaning of the Fourth Amendment occurs whenever one's reasonable expectation of privacy is violated by unreasonable governmental intrusion. (*People* v. *Triggs* (1973) 8 Cal.3d 884, 891 [106 Cal.Rptr. 408, 506 P.2d 232]; *People* v. *Edwards, supra,* 71 Cal.2d 1096, 1104; see *Katz* v. *United States, supra,* 389 U.S. 347, 353 [19 L.Ed.2d 576, 583, 88 S.Ct. 507, 512].)

Next, the Attorney General fastens upon the rule that to warrant constitutional protection, an expectation of privacy must be reasonable. He alleges that even if we were to assume that the police activity in this case amounted to an unreasonable governmental intrusion, the activity did not fall within the perimeters of the Fourth Amendment because appellant Stuart Smith had no expectation of privacy while he was flying his airplane; the Attorney General maintains that Stuart Smith knew or,

as a pilot, should have known that the flightpath of an airplane can be kept under surveillance by police authorities through the use of police aircraft, flight plans or sophisticated ground equipment operated by the Federal Aviation Administration to monitor air traffic.

The Attorney General's argument on this point is diversionary and does not come to grips with the real issue. The question presented in this appeal is not whether Stuart Smith had a reasonable expectation of privacy in the sense that he could expect that his aircraft would not be followed or tracked by the use of conventional methods. The pivotal question, and the one we are called upon to answer, is whether Smith reasonably could expect that the police would not impermissibly intrude into the airplane itself and install a special tracking device hidden from view, in order to keep that very airplane under constant police surveillance so that they could gather incriminating evidence against him. A brief review of the cases which have dealt with similar problems should be helpful.

In *Katz* v. *United States* (1967) *supra,* 389 U.S. 347, federal agents attached an electronic listening and recording device to the outside of a telephone booth to monitor the defendant's telephone calls; the telephone booth was constructed partly of glass and the defendant was visible as he was making the calls. The Supreme Court determined that the government's activity amounted to a Fourth Amendment search and seizure. The court explained: ". . . the Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. [Citations.] But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected. [Citations.]" (*Supra,* 389 U.S. at pp. 351-352 [19 L.Ed.2d at p. 582, 88 S.Ct. at p. 511].)

The court also rejected the government's contention that the defendant had no reasonable expectation of privacy because the telephone booth was constructed partly of glass and he was in plain view when the calls were being made. As to this point the high court stated: ". . . what he sought to exclude when he entered the booth was not the intruding eye—it was the uninvited ear. He did not shed his right to do so simply because he made his call from a place where he might be seen." (*Supra,* 389 U.S. at p. 352 [19 L.Ed.2d at p. 352, 88 S.Ct. at p. 511].)

In *People* v. *Triggs* (1973) *supra,* 8 Cal.3d 884 the defendant committed an act of oral copulation on another in an open toilet stall in a public restroom. The police observed the act through a peephole in the roof of the restroom. The California Supreme Court reversed the defendant's conviction on the ground that his Fourth Amendment rights had been violated. The court reasoned that one's reasonable expectation of privacy is violated if the governmental observation of criminal behavior is from a hidden vantage point which most persons would have no reason to suspect was being so used, and that this is true even though the same criminal behavior could have been observed by the police and others from vantage points at which they had the right to be. (*Supra,* 8 Cal.3d at pp. 891-892, 894, fn. 7.)

In *People* v. *Sneed* (1973) 32 Cal.App.3d 535 [108 Cal.Rptr. 146] the defendant was convicted of growing marijuana plants after a police helicopter flew over the defendant's backyard at a height of 20 to 25 feet and spotted the growing plants. In that case, this court held that the low-flying police helicopter violated the defendant's reasonable expectation of privacy, even though the marijuana plants could have been observed from a neighbor's yard, cropdusting airplanes or mosquito abatement helicopters. In this connection, Presiding Justice George A. Brown speaking for the court said: ". . . though a person may have consented to observations from some sources and by some persons and therefore cannot have a reasonable expectation of privacy as to those sources or persons, he does not thereby forego his Fourth Amendment protection as to intrusions from all sources and by all persons, . . ." (*Supra,* 32 Cal.App.3d at p. 541.)

In *United States* v. *Hufford* (9th Cir. 1976) *supra,* 539 F.2d 32, government agents, who suspected one James Hufford of manufacturing illegal drugs, learned that the suspect had ordered two large drums of caffeine from a chemical company in Portland, Oregon; caffeine is a chemical used in the manufacture of amphetamines. With the consent of the chemical company, the agents installed an electronic tracking device in one of the drums; sometime later Hufford picked up the drums in a pickup truck and drove circuitously to a residential garage in Eugene, Oregon; the agents followed by relying upon the tracking device. In Eugene the agents, pursuant to a court order, installed a tracking device to the battery of Hufford's vehicle while it was parked in the garage. Through the use of this second tracking device, the agents traced the pickup truck to a house in Dallas, Oregon; they then obtained search

warrants and after searching the premises found drug-manufacturing paraphernalia and amphetamines in the house and the garage. In upholding Hufford's conviction the Court of Appeals rejected the idea that Hufford's reasonable expectation of privacy was to be assessed in light of his movements along the public highways; instead the court focused upon a person's reasonable expectation to be free from having a tracking device installed in hidden places in articles of property which belong to or are in the possession of the person when the installation is made; it approved the installation of the tracking device in the drum without a warrant in that case because the drum still was owned and in the possession of the chemical company when the installation took place.

In *United States* v. *Pretzinger* (9th Cir. 1976) 542 F.2d 517, 520, an electronic tracking device was attached to an airplane pursuant to a warrant authorizing the installation. The Court of Appeals likewise concluded that defendant's reasonable expectation of privacy was not to be judged in light of his movements through the public air spaces. In discussing the need for a warrant, the court suggested that no warrant is needed to justify the installation of an electronic tracking device if Fourth Amendment rights are not violated in order to initially install the device.

From the *ratio decidendi* of the cases we have reviewed, it seems clear to us that the Fourth Amendment and its prophylactic proscriptions come into play not only when the police authorities are looking for something that is concealed, but also when the police, in order to facilitate the discovery and gathering of evidence, impermissibly enter private property to install electronic surveillance equipment in a location which most persons would have no reason to suspect is being used for such a purpose even though other unobjectionable methods are available for discovering and gathering the same evidence. If the Fourth Amendment protects a person who commits a sex offense in an open toilet stall in a public restroom from police intrusion from a vantage point he has no reason to suspect, a fortiori, the Fourth Amendment shields the owner or renter of an airplane from police intrusion into the aircraft itself for the purpose of installing a tracking device to make it possible for police authorities to gather incriminating evidence against him.

In a final effort to uphold the lower court's ruling, the Attorney General suggests that the marijuana seized at Columbia Airport was not the "fruit" of the illegally installed transponder (*Wong Sun* v. *United*

*States* (1963) 371 U.S. 471, 487-488 [9 L.Ed.2d 441, 455-456, 83 S.Ct. 407, 417]), and that in any event the marijuana would have been discovered without the transponder (see *People* v. *Aylwin* (1973) 31 Cal.App.3d 826, 838 [107 Cal.Rptr. 824]; *People* v. *Thomsen* (1965) 239 Cal.App.2d 84, 91 [48 Cal.Rptr. 455]). Stated in another manner, the Attorney General apparently argues that there was no causal connection between the installation of the transponder and the seizure of the marijuana at Columbia Airport because the search and seizure at the airport would have occurred anyway as a border search. He also apparently argues that the contraband would have been inevitably discovered by the police authorities, either because the transponder could have been lawfully installed in Brawley, or because the police would have intercepted the Cessna airplane when it returned to this country, with or without the transponder, and by that time, through visual surveillance and other factors not connected with the transponder, would have had ample cause to search the airplane.

The validity of these arguments is dependent upon factual issues which never were raised in the court below. During the hearing on appellants' suppression motions, the People merely argued that the installation of the transponder did not constitute an illegal search and at no time challenged appellants' contention that the seizure of the contraband was a "fruit" of that installation. The People presented no evidence to prove that the Cessna airplane would have been searched at Columbia Airport as a routine border search or that in the absence of the transponder the aircraft would have been intercepted by police authorities when it entered this country. On the contrary, according to the record, the transponder was directly responsible for tracing the airplane to Columbia Airport where the illegal cargo was seized; the undisputed evidence shows that the agents of the Drug Enforcement Administration and the officers of the United States Customs Service lost all contact with the Cessna at Brawley and that contact was not regained until the authorities were advised that the San Diego Approach Control Tower had picked up on a radar screen the signals emanating from the transponder; visual contact was established a short time later. (See *People* v. *Demoray* (1970) 5 Cal.App.3d 127, 131 [84 Cal.Rptr. 924].)

It is elementary that a new theory cannot be raised on appeal where, as here, the theory contemplates factual situations the consequences of which are open to controversy and were not put in issue in the lower court. (*Panopulos* v. *Maderis* (1956) 47 Cal.2d 337, 341 [303 P.2d 738]; see

*Lorenzana* v. *Superior Court* (1973) 9 Cal.3d 626, 640 [108 Cal.Rptr. 585, 511 P.2d 33]; *People* v. *Superior Court (Simon), supra,* 7 Cal.3d 186, 198-199; *Ernst* v. *Searle* (1933) 218 Cal. 233, 240-241 [22 P.2d 715].)[3]

In Tuolumne County Superior Court action No. 15508 (Shawhan) the judgment is reversed.

In Tuolumne County Superior Court action No. 15509 (Smith) the order granting probation is reversed and the purported appeal from the order denying the motion to suppress evidence is dismissed.

In Tuolumne County Superior Court action No. 15510 (O'Neill) the order granting probation (mislabeled a "judgment" in the notice of appeal filed on Aug. 1, 1975) is reversed and the purported second appeal from the "judgment," taken on August 7, 1975, is dismissed.

Brown (G. A.), P. J., and Franson, J., concurred.

A petition for a rehearing was denied March 29, 1977, and respondent's petition for a hearing by the Supreme Court was denied May 19, 1977.

---

[3]It does not follow from this decision, however, that the evidence seized from the airplane is inevitably inadmissible. The case is, of· course, subject to attempted reprosecution by the district attorney, and upon retrial the prosecution, among other things, may be able to establish that the evidence in question is not a "fruit" of the illegally installed transponder as the Attorney General tried to argue in these appeals. (*Lorenzana* v. *Superior Court, supra,* 9 Cal.3d 626, 640, fn. 11; *People* v. *Edwards, supra,* 71 Cal.2d 1096, 1106.) Likewise, nothing in this opinion should be construed as prohibiting a prosecution for a.conspiracy, like the one charged herein, if the conspiracy itself and the overt acts in furtherance of the conspiracy can be proved independent of any "fruit" of the illegal installation. In the present case all of the charged overt acts related either to Smith and O'Neill's landing at Columbia Airport or Smith and Shawhan's subsequent attempt to take off.