[No. C004752. Third Dist. Feb. 9, 1990.]

THE PEOPLE, Plaintiff and Respondent, v.
SUSAN CHARLENE MOSES, Defendant and Appellant.

---

COUNSEL

Katherine Hart, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Richard B. Iglehart, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Jane N. Kirkland and Susan J. Orton, Deputy Attorneys General, for Plaintiff and Respondent.

---

OPINION

DAVIS, J.—Defendant Susan Charlene Moses, appeals from a conviction of one count of receiving stolen property in violation of Penal Code section 496.[1] (Further undesignated statutory citations refer to the Penal Code.) A

[1] Section 496 states in part: "Every person who buys or receives any property which has been stolen or which has been obtained in any manner constituting theft or extortion, knowing the property to be so stolen or obtained, or who conceals, sells, withholds or aids in concealing, selling, or withholding any such property from the owner, knowing the property to be so stolen or obtained, [is guilty of a crime]."

jury convicted defendant of receiving or concealing a 14-month-old heifer belonging to Cecilia Murray.[2] On appeal, defendant makes numerous challenges to the proceedings below. We need only address her claim that the record lacks substantial evidence that anyone stole the heifer.

The prosecution charged and tried the case on a theory of a larcenous taking and requested instructions only on theft by larceny. We agree with defendant that the record contains no evidence of theft by larceny. On appeal, the People now argue that the heifer became stolen once defendants misappropriated it under section 485.[3] We hold that defendants cannot be convicted on a theory neither advanced at trial nor factually determined by the jury. Moreover, we conclude that the acts of alleged misappropriation under section 485 formed one uninterrupted course of conduct with the acts alleged as concealment under section 496. As such, as a matter of law, defendants cannot be convicted of concealing or withholding property misappropriated by the same acts. (*People* v. *Tatum* (1962) 209 Cal.App.2d 179, 185 [25 Cal.Rptr. 832]; see *State* v. *Para* (1978) 120 Ariz.App. 26 [583 P.2d 1346, 1349-1350].) Accordingly, we shall reverse.

## BACKGROUND

In April 1987, Cecilia Murray sold all of her small herd of cattle, save one 14-month-old heifer, to her neighbor, Jim White. White lived about a mile from Murray. Soon after, Murray's heifer twice strayed from her pen. The first time, the heifer apparently returned by herself to Murray's pasture. The second time, Murray's neighbors, Terry and Jessie Shields, penned the heifer up and kept her three or four days. When the Shields went to take the heifer from their pen to return her to Murray, the heifer was missing again.

Initially, Murray launched no search after her wandering heifer's third disappearance. She thought that it had merely walked from the Shields's property to White's property and rejoined her former herd. After two to two and a half weeks passed, White phoned Murray. He reported that other

---

[2] The jury also convicted defendant's husband, Thomas Reed Moses, of the same offense. Charged in a different information from her husband, she was tried with him for theft and receiving stolen property. She has separately appealed from his conviction. For oral argument, we consolidated Susan Moses' appeal with her husband's. We separately resolve her appeal in our case number 3 Crim. C004752. For convenience, however, we refer to Thomas and Susan Moses as "defendant" or "defendants" as the context requires.

[3] Section 485 states: "One who finds lost property under circumstances which give him knowledge of or means of inquiry as to the true owner, and who appropriates such property to his own use, or to the use of another person not entitled thereto, without first making reasonable and just efforts to find the owner and to restore the property to him, is guilty of *theft*." (Italics added.)

neighbors, the defendants, possessed a cow about the same amount of time that Murray's heifer had been missing.

On May 13, 1987, accompanied by her daughter, Deborah Garman, Murray drove to the defendants' house. They lived about a mile from Murray. Murray and Garman spoke with defendant Susan Moses. Murray asked Susan Moses if she had seen Murray's heifer. Moses said she had not.

From their vantage point on defendants' front porch, Murray and Garman saw what looked like Murray's heifer in a pen in defendants' yard. Indeed, Murray claimed that at one point during their visit with Moses, the heifer "ran to the fence and bawled at [Murray and Garman]." According to Murray and Garman, Susan Moses admitted owning a heifer, but claimed it was an orphan from one of her cows.[4] Murray and Garman then left and inquired about the missing heifer at some other neighbors' houses.

A short while later, back home, Garman spoke with her sister on the phone. Information received from that call prompted Garman to get in her vehicle.[5]

Garman saw defendants' trailer rig heading down the road. She followed the rig. After about 10 minutes, the rig pulled over. When Garman pulled in behind, Susan Moses left the trailer rig and approached her. Moses asked Garman whether she was following them, and Garman said, "Yes." Garman asked whether defendants had loaded a calf into the trailer. When Susan Moses claimed it was none of Garman's business, Garman left to go to her mother's house and get the sheriff.

Garman met Deputy Sheriff Andrew Hiebert at Murray's house. They left and headed towards where Garman had last seen defendants. Along the way, they spotted defendants returning. Hiebert turned around and pulled defendants over.

Both defendants were inside the truck that towed the trailer. The disputed heifer was in the trailer. Susan Moses got out and talked with Hiebert.

Moses showed Hiebert a bill of sale for the heifer. She claimed that she had received both the bill of sale and the heifer several months before as a present for her son's birthday. She also claimed that she and her husband were merely transporting the heifer to the Weston ranch to have it

---

[4] At trial, Susan Moses denied that she called the heifer in her pen an "orphan."

[5] The record does not contain the substance of either the phone conversation or the "information" Garman received.

dehorned. When Hiebert pointed out that the heifer still had its horns, Moses said that they had decided that it was too late that day for dehorning.

Hiebert arrested both defendants for grand theft. On September 16, 1987, the People filed separate informations against each defendant. Each defendant was charged with one count of grand theft by larceny and one count of receiving stolen property ". . . knowing that said property had been *stolen*." (Italics added).[6]

Prior to trial, the court consolidated the two cases. At trial, the defendants presented a misidentification defense. In essence, they claimed that the heifer Murray lost was not the heifer they had penned in their yard. The evidence over the heifer's identity conflicted greatly.

Following closing argument, the court instructed the jury on the elements of theft by larceny and receiving stolen property. The court told the jury that the two charges were "made in the alternative" and that it could only convict the defendants, if at all, on one of the two counts. After less than a day of deliberation, the jury acquitted defendants of grand theft but found them guilty of receiving stolen property.

Defendants were placed on probation for three years. As a condition of probation, the court ordered each defendant confined in the county jail for 60 days and imposed penalties and restitution totalling $570 apiece. Defendants appeal from the orders granting probation.

## DISCUSSION

On appeal, we need only address defendants' claim that the record lacks substantial evidence to support conviction of receipt of stolen property in violation of section 496. In order to establish the commission of the crime of receiving stolen property on a theory of a larcenous taking, it must be established by substantial evidence (1) that the particular property was stolen, (2) that the accused received, concealed or withheld it from the owner thereof, and (3) that the accused knew that the property was stolen.

---

[6] The People alleged violations of Penal Code sections 487, subdivision 3 and 496. Section 487, subdivision 3, makes all theft of bovines grand theft. Section 496 governs receipt or concealment of stolen property.

The information also charged each defendant with one count of unlawful receipt of welfare aid and one count of perjury. These two counts involved the defendants' failure to report certain income and property on their applications for aid and medical assistance.

The trial court severed trial on the theft counts from trial on the unlawful aid receipt counts. In our case number 3 Crim. C005155, we consider Thomas Moses' appeal from the sentence imposed after he pleaded guilty to a misdemeanor count of unlawful receipt of aid.

(*People* v. *Vann* (1974) 12 Cal.3d 220, 224 [115 Cal.Rptr. 352, 524 P.2d 824].)

■ "In reviewing a judgment of conviction, an appellate court, of course, must view the evidence in the light most favorable to the People and presume in support of that judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] The test is whether there is substantial evidence to support the conclusion of the trier of fact [citation] . . . ." (12 Cal.3d at p. 225.) " '[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.]" (*People* v. *Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255], italics in original.) " 'The test on appeal is whether substantial evidence supports the conclusion of the trier of fact, not whether the evidence proves guilt beyond a reasonable doubt.' " (*Ibid.*) Substantial evidence must be "reasonable in nature, credible, and of solid value . . . ." (*Estate of Teed* (1952) 112 Cal.App.2d 638, 644 [247 P.2d 54].)

As noted above, in this case the prosecution attempted to establish the heifer's "stolen" character by arguing and instructing only on theft by larceny. In many cases involving receipt or concealment of stolen property, the theft itself is uncontroverted. (See, e.g., *Vann, supra*, 12 Cal.3d at p. 224; cf. *People* v. *Morris* (1988) 46 Cal.3d 1, 40-41 [249 Cal.Rptr. 119, 756 P.2d 843] [open question whether "loaned" credit card was stolen].) Such cases turn frequently on the defendant's knowledge of the theft. Since direct evidence of defendant's knowledge rarely exists, circumstantial evidence often comes from "possession of stolen property accompanied by no explanation or unsatisfactory explanation, or by suspicious circumstances . . . ." (*People* v. *Myles* (1975) 50 Cal.App.3d 423, 428 [123 Cal.Rptr. 348]; see also *Vann, supra*, 12 Cal.3d at p. 220.)

The usual case, however, involves inanimate property. Since jewelry, televisions, and automobiles rarely disappear on their own volition, the circumstances can usually suggest that someone took them without permission. The People need not prove *who* stole the property; they only need show that *someone* stole it. (See, e.g., *People* v. *Avila* (1872) 43 Cal. 196, 199.)

■ Here, however, the missing property had a mind of its own. The heifer had wandered off twice from Murray's pen in the week before her disappearance from the Shields's pen. No evidence of any type suggests that *anyone* stole the heifer from the Shields's pen prior to this last disappearance. No one saw anyone enter the Shields's premises and leave with the

heifer. No one reported strange noises, footprints, tire marks, clipped fence wires, or jimmied locks on the Shields's property. No suspicious circumstances of any kind suggest any human involvement in the heifer's departure from the Shields's pen. Indeed, Murray herself suspected no wrongdoing initially. In sum, absolutely nothing suggests that anyone stole the heifer out of her pen. ■ (See fn. 7.) On this record, we can only infer that the heifer strayed again before ending up on defendants' property.[7]

■ Thus, under the theory of theft expressly charged in the information, and the only theory of theft presented to the jury, no evidence supports a finding that *anyone,* much less the defendants before us, stole the heifer by larceny. Accordingly, absent such evidence, defendants could only be found to have concealed or withheld a *stray* heifer.

On appeal, the People now argue that the property became "stolen" by the defendants' misappropriation of the heifer. The People argue that, under section 485, "[m]isappropriation of the heifer, even if initially an 'estray,' did constitute the offense of receiving stolen property." The prosecution, however, cannot now change its theory on appeal and argue that the heifer had not been stolen but instead had been obtained by misappropriation under section 485. ■ "It is elementary that a new theory cannot be raised on appeal where, as here, the theory contemplates factual situations the consequences of which are open to controversy and were not put in issue in the lower court. (Citation.)" *(People* v. *Smith* (1977) 67 Cal.App.3d 638, 655 [136 Cal.Rptr. 764], citing *Panopulos* v. *Maderis* (1956) 47 Cal.2d 337, 341 [303 P.2d 738].) ■ Section 485 requires that the lost property be found under circumstances which give the finder "knowledge of or the means of inquiry as to the true owner." That factual question was not litigated and was subject to controversy. Consequently, that theory cannot be used to save the conviction. And since the only theory

---

[7] In his closing argument below, the prosecutor admitted that "it hasn't been proven that [the defendants] actually went over to . . . the victim's house and took the cow and put it in their pen. It could have strayed over there or it could have strayed somewhere else and they physically took control over it. But in any event, they took the calf and put it in their pen. Therefore, we have a taking. And we do not have to prove that they actually took it from the victim's pen."

To constitute a taking, however, the defendants must remove it from the owner's actual or constructive possession. (See, e.g., 2 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) § 578, at pp. 655-656.) The record lacks any evidence suggesting that the defendants took the heifer from the victim's actual possession. Rather, it merely appears to have strayed.

Of course, the owner of lost property may retain constructive possession of the property. (See, e.g., *id.* at § 580, p. 657.) Nevertheless, absent notice to the finder of the owner's identity, a finder who retains lost property commits no theft. (*Ibid.,* citing Pen. Code, § 485.) Thus, a taking from the true owner's "constructive possession" arises only if the finder has the requisite notice. The record here shows the defendants had no notice of Murray's claims until her arrival at their ranch and her talk with Susan Moses.

buttressing the conviction lacks evidentiary support, the judgment must be reversed for lack of evidence.

Moreover, the People's argument ignores the well established rules governing the interaction of the laws of theft and receipt of stolen property. In particular, it fails to distinguish the acts forming misappropriation under section 485 from the acts forming concealment or withholding under section 496.

■ "It has been held a thief may not be convicted under section 496 for 'concealing' or 'withholding' stolen property as these acts are part and parcel of the theft." (*People* v. *Tabarez* (1988) 206 Cal.App.3d 551, 554 [253 Cal.Rptr. 658], citing *People* v. *Tatum, supra,* 209 Cal.App.2d 179, 183-186; see also *People* v. *Stewart* (1986) 185 Cal.App.3d 197, 203 [229 Cal.Rptr. 445].) In *People* v. *Tatum, supra*, the court discussed at length the problems of convicting a thief of concealing the stolen property. ■ The court initially reiterated the longstanding rule that "a thief may not be convicted under [section 496] of 'buying' or 'receiving' the goods which he has previously stolen [citations], with the possible exception of the situation where the thief has disposed of the property and subsequently received it back in a transaction separate from the original theft." (209 Cal.App.2d at p. 183; see generally 2 Witkin & Epstein, Cal. Criminal Law, *supra*, § 630, at pp. 707-710.)[8] The court then found two reasons why the same rule generally applies to attempts to convict the thief of concealing or withholding the stolen property.

First, the court discussed the legislative intent behind section 496. According to the court, the Legislature directed the statute "at the traditional 'fence' and at those who lurk in the background of criminal ways in order to provide the thieves with a market or depository for their loot. Such offenses are essentially different from the actual theft of property prohibited by [the theft statutes.] *Every theft, every wrongful misappropriation, of necessity, contemplates and involves a permanent withholding from the owner. To conceal and withhold is the thief's purpose from the very moment that he gains possession of the property. It is part and parcel of the theft. But such concealment and withholding is not that envisaged by section 496.* If the Legislature had intended in that section to embrace concealment of stolen property by the thief, it would have been a simple matter to say 'every thief or any other person . . . who conceals, etc.' " (*People* v. *Tatum, supra,* 209 Cal.App.2d at p. 183, italics added.)

---

[8] Conviction of both theft and receiving is also possible if the thief and recipient have conspired together to steal and receive the stolen property. (See, e.g., *People* v. *Jaramillo* (1976) 16 Cal.3d 752, 759, fn. 8 [129 Cal.Rptr. 306, 548 P.2d 706].)

Second, the court noted that the statutory scheme governing theft and concealment of stolen property frequently imposes harsher punishment on the fence than on the thief. (12 Cal.3d at p. 184.) The court noted: "These conflicts and untoward results are avoided, leaving the underlying purposes unimpaired, by construing section 496 as a statute directed primarily at persons who do not physically participate in the actual theft of the property." (*Ibid.*)

Finally, the court summarized its conclusions: "in the absence of facts indicating a complete divorcement of the concealing activities from the course of conduct of the thief in the initial concealing of the property stolen by him, a thief may not be found guilty of concealment in violation of [section 496.]" (12 Cal.3d at p. 184.) It then applied its rule to the case before it: "there was no evidence of concealment independent of that involved in the theft. In the absence of such evidence it was error to instruct the jury that they could find defendant guilty of concealment even though they believed he had stolen [the property.] [¶] *Had there been evidence of acts of concealment entirely separate and apart from the theft and sufficiently removed therefrom to constitute an independent course of conduct, then an instruction which clearly spelled out such distinction could properly have been given.*" (*Id.* at pp. 184-185, italics added.)

In *State v. Para, supra,* 583 P.2d 1346, the Arizona Court of Appeals applied *Tatum* to circumstances very similar to those before us here. *Para* involved a defendant convicted of receiving or concealing seven horses.[9] The evidence showed that one Robert McCormick found 12 stray horses on his ranch. Some of the horses apparently bore defendant Frank Para's brand. McCormick called Para and had him come try to round the horses up. Para came, saw the horses from a distance, and identified them as his. Unable to corral them that day, Para and his ranch manager, Leonard DesMarais, said they'd have someone capture them later. (*Id.* at p. 1347.)

McCormick then rounded up nine of the strays and had DesMarais pick them up. DesMarais did not examine the horses closely, but noticed that two of the horses bore Para's brand. The next day, Para looked over the nine. He instructed DesMarais to treat the nine differently from the other horses.[10] The different treatment given the horses coupled with their obvious

---

[9] The Arizona equivalent to section 496 stated: "A person who, for his own gain, or to prevent the owner from again possessing the property, buys, sells, possesses, *conceals* or receives personal property, knowing or having reason to believe that the property is stolen, is guilty of a misdemeanor, if the value of the property is less than one hundred dollars, and is guilty of a felony if the value of the property is one hundred dollars or more." (Ariz. Rev. Stat. Ann. § 13-621(A), as quoted in *Para, supra,* 583 P.2d at p. 1349.)

[10] Para earned income renting horses out for recreational riding. (583 P.2d at p. 1348, fn. 1.) He ordered DesMarais not to brand or sell the horses. DesMarais later testified that these

physical differences from the rest of Para's herd led DesMarais ultimately to question Para's ownership. (583 P.2d at p. 1348.) When he confronted Para, Para told him " 'if they weren't his horses, that [DesMarais] would fall with him if he would get charged with anything.' " (*Ibid.*)

At the same time that McCormick first saw the strays on his land, one Robert Lockett discovered seven horses missing from his ranch. Lockett eventually went to Para's stables and described the missing horses to Para. Para denied any knowledge of the stray horses. Lockett then talked to McCormick and learned that the horses Para had retrieved from McCormick's ranch were similar to Lockett's missing seven. Lockett returned to Para's ranch and found his horses.[11] (583 P.2d at p. 1348.)

Para was eventually charged with six counts of grand theft. The court declared a mistrial after the jury hopelessly deadlocked. (583 P.2d at p. 1348.) A grand jury then returned the seven-count receiving stolen property indictment. After trial, a jury convicted Para of all seven-counts. (*Id.* at p. 1349.)

On appeal, the court noted that there was no evidence that anyone took Lockett's horses by larceny: "Lockett let the horses out on range land to graze for an extended period of time. Gradually, he became aware that the horses were no longer on his ranch. The state offered no evidence showing that the only way the horses could have gotten to McCormick's ranch was by theft. The only reasonable inference from the evidence presented is that the horses simply strayed onto McCormick's ranch. Thus, the theft must have occurred at some other time." (583 P.2d at p. 1349.)

The court then decided that DesMarais could not have stolen the horses when he transported them from McCormick's to Para's ranch "because there is no evidence that he possessed the requisite intent to steal . . . ." (583 P.2d at p. 1349.) That left Para the only potential thief for "possessing and concealing horses he knew were not his." (*Ibid.*, fn. omitted.)

The court explained: "If the jury found that appellant realized at some point that some of the horses did not belong to him and subsequently concealed the horses from the true owner, then the horses became stolen property at that time. [Citation.]" (583 P.2d at p. 1349.) It then noted that

were the only horses Para had ever refused to sell. (*Id.* at p. 1348.) Also, when one of the horses died, Para ordered it buried instead of sold to a rendering company. (*Ibid.*)

[11] At first, upon Lockett's return, Para still denied knowledge of Lockett's horses and offered to prove Para's ownership of the disputed group. He only relented when Lockett showed that one of a group of six bore Lockett's brand. Para and DesMarais still denied possessing the seventh missing Lockett horse even though they had buried it the week before Lockett's visit. Later, DesMarais had the horse exhumed and Lockett identified it as the last of his missing bunch. (*State* v. *Para, supra*, 583 P.2d 1346.)

while a thief cannot also be guilty of *receiving* the stolen property, the thief "could be guilty of possessing or concealing stolen property." (*Ibid.*) Citing *People* v. *Tatum, supra,* and *People* v. *Taylor* (1969) 2 Cal.App.3d 979, 984 [83 Cal.Rptr. 119], the court predicated such guilt upon a showing that "the concealing and withholding [is] completely divorced from the initial concealment following the theft." (*Para, supra,* 583 P.2d at p. 1349.)

The court summarized its rule: "in order to return a verdict of guilty, the jury had to find (1) that [Para] stole the horses by possessing or concealing them when he knew they were not his, and (2) that [he] committed further acts of possession or concealment." (583 P.2d at p. 1350.) The court concluded that the record before it presented enough evidence to go to the jury. The trial court, however, had instructed improperly; "while the instruction properly allowed the jury to hold [Para] guilty if it found he possessed or concealed stolen property, it failed to explain fully that *the jury must find at least two distinct and separate acts of concealment.*" (*Ibid.*, italics added.) The court thus reversed Para's convictions. (*Ibid.*)

We believe that *Para* properly formulates *Tatum*'s rule in circumstances where the only evidence of theft is theft by misappropriation of property otherwise innocently received. Section 496 speaks of "concealing" and "withholding" property that has been "stolen." ■ By its very nature, theft by misappropriation involves a withholding or concealment of property from the true owner. Indeed, under section 485, the property does not become stolen by misappropriation until the holder knows of the true owner's identity and then fails to take reasonable steps to restore the property to its rightful owner. Where the wrongful retention of property *makes* the property "stolen," the record must demonstrate some other wrongful retention before the retainer is further guilty of "concealing" that which has been wrongfully retained in the first place. In the words of *Tatum* and *Para*, the subsequent acts of concealment must be so "completely divorced" from the original misappropriation as to "constitute an independent course of conduct."

Although we agree with *Para*'s formulation of the rule, the circumstances before us require a different result. There, the Arizona "receiving" statute also made "possessing" stolen property as culpable as "concealing." Three days passed between Para's initial and subsequent denials of Lockett's ownership. On that record, the court concluded that a jury might determine that Para had committed *two* completely separate wrongful acts of retention.

■ Here, however, the evidence shows that the earliest defendants had notice of the true owner's identity was upon Murray's visit to their ranch

and her talk with Susan Moses. Shortly after Murray left the defendants' ranch and returned to her home, she learned that they had taken the heifer away in their van. As a matter of law, we find that the defendants' acts upon Murray's visit and departure formed a single, undivorced course of concealment. As such, defendants cannot be liable for concealing the property they misappropriated, since the acts of concealment were part and parcel of the acts of misappropriation itself.

Accordingly, defendant's conviction for violation of section 496 cannot stand.

## DISPOSITION

The judgment is reversed.

Sparks, Acting P. J., and Sims, J., concurred.