**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CRS RECOVERY, INC., A Virginia
corporation; DALE MAYBERRY,
        *Plaintiffs-Appellees,*

v.

JOHN LAXTON, AKA
johnlaxton@gmail.com; NORTH
BAY REAL ESTATE, INC.,
        *Defendants-Appellants,*

and

TIGER-CDM; BARNALI KALITA,
AKA barnali.kalita@gmail.com; LI
QIANG, AKA Jonathan Lee, AKA
nameowner@yahoo.com; RL.COM;
MAT.NET; BULK REGISTER; WILD
WEST DOMAINS, DBA
Domaincity.Com; GUAN YU,
        *Defendants.*

No. 08-17306

D.C. No.
4:06-cv-07093-CW

OPINION

Appeal from the United States District Court
for the Northern District of California
Claudia Wilken, District Judge, Presiding

Argued and Submitted
January 13, 2010—San Francisco, California

Filed April 6, 2010

Before: John T. Noonan, Michael Daly Hawkins and
Milan D. Smith, Jr., Circuit Judges.

5227

Opinion by Judge Hawkins;
Dissent by Judge Noonan

**COUNSEL**

Michael D. Morris, Hornstein Law Offices, San Francisco, California, for the defendants-appellants.

Charles Carreon (argued), Online Media Law, Tucson, Arizona, and Stevan Lieberman, Greenberg & Lieberman, Washington, D.C., for the plaintiffs-appellees.

**OPINION**

HAWKINS, Circuit Judge:

This case requires application of traditional choice-of-law, tort, and property principles to an increasingly common factual setting, a dispute over the ownership of an Internet domain name. John Laxton ("Laxton") and his assignee North Bay Real Estate, Inc. appeal the adverse summary judgment for Dale Mayberry ("Mayberry") and his assignee CRS Recovery, Inc. ("CRS"). The district court was correct to apply California law, but we find disputed issues of material fact and remand.

## I.   BACKGROUND

### A.   Background Facts

On July 23, 1995, Mayberry, a citizen of Virginia, registered the domain name "rl.com". The registration was effected by a contract with domain name registrar Network Solutions, Inc., a Delaware corporation headquartered in Herndon, Vir-

ginia. Network Solutions is one of the largest domain name registrars in the world and for a $100 fee registers a client's domain name with the Internet Corporation for Assigned Names and Numbers, commonly referred to as ICANN. Mayberry's registration of rl.com was renewable for $50 per year. After the initial registration, Mayberry renewed the domain name periodically, last doing so on July 23, 2002, when he paid in advance for three years so that the registration would expire on July 24, 2005.

Mayberry's contract with Network Solutions identified the administrator of the website as Micro Access Technologies, Inc. ("MAT"), a company owned by Mayberry. Specifically, Mayberry made MAT, through "mat.net", the administrative contact for both domain names, mat.net and rl.com. He thus exercised administrative control over both websites through the e-mail address "dale@mat.net". In 2001 mat.net ceased operation. Mayberry failed to notify Network Solutions that mat.net was no longer operative.

The parties dispute the precise circumstances of Mayberry's loss of mat.net and, therefore, the loss of rl.com. Laxton asserts that Mayberry let the registration expire by its terms, but Mayberry contends he attempted to renew the domain name. Laxton's expert claimed that Mayberry is "incorrect" in insisting the registration still belonged to Mayberry on December 19, 2003, and that Mayberry "abandoned Mat.net by letting it expire on its own terms on October 2." At his deposition, Mayberry stated that he was still the registrant of mat.net on December 19, 2003, a claim Laxton vigorously contested both at the district court and on appeal. The district court concluded that "[t]he circumstances surrounding the transfer of mat.net are not entirely clear."[1]

---

[1] While the dissent argues that finding any abandonment on this record is impossible, abandonment is a question of intent to be determined upon all the facts and circumstances. *Martin v. Cassidy*, 307 P.2d 981, 984 (Cal. Ct. App. 1957). It is possible that Laxton could prove that, given Mayber-

Despite these unresolved factual issues, we can establish the following from the record. On December 19, 2003, a new registration of mat.net was made by a man named Li Qiang ("Qiang"). The registration was made on Beijing Sinonets Network & Telecom Co. Qiang's control of mat.net permitted him to designate his e-mail address as dale@mat.net and to receive e-mail at this address in place of Mayberry. Using this e-mail address, Qiang transferred ownership of the domain name rl.com to himself. Network Solutions accepted the transfer, acting in the belief that it was being made by Mayberry, who in fact was unaware of Qiang's actions. Qiang later transferred the domain name to Barnali Kalita ("Kalita"), a citizen of India. In May 2005, Kalita sold the name to Laxton, a citizen of California, for $15,000. Prior to the purchase, Laxton contends he checked rl.com with the World Intellectual Property Organization ("WIPO") to ensure there were no disputes involving the domain name. Determining there were none, Laxton consummated the purchase and assigned the name to Real Estate Loans, Inc., a California corporation he owns.

Mayberry, meanwhile, discovered that he had lost control of both domain names. He assigned his interest in rl.com to CRS, a Virginia corporation, in exchange for an undisclosed sum of cash and the company's promise to help him recover the lost names. Contact was made with Laxton, who, having just spent thousands of dollars successfully defending rl.com from a WIPO action brought by Ralph Lauren, declined to

ry's alleged abandonment of mat.net, his long delay in attempting to reestablish control over the website, and his demonstrated familiarity with registering and re-registering domain names, that Mayberry evidenced an intent to intentionally relinquish his rights in the property, i.e., abandon it. This determination is a question of fact, and is not a proper matter for summary judgment where, as here, Laxton has raised material questions regarding Mayberry's intent. This is particularly true when these questions of intent cannot be answered because underlying questions regarding the websites' transfer are disputed as well.

surrender his control over the domain name. This lawsuit followed.

## B. Procedural History

On October 30, 2007, Mayberry and CRS filed their second amended complaint against Laxton, Kalita, Qiang, and others, charging them with theft of the two domain names. Count 1 charged conversion of the domain names and conspiring to convert them. Count 2 charged the defendants with interference with Mayberry's contracts with Network Solutions. Count 3 charged unfair competition. Count 4 asked for declaratory relief under 28 U.S.C. § 2201, affirming the plaintiffs' right to control the identity of the registrants of the two domain names. The plaintiffs prayed for a return of the domain names and disgorgement of the defendants' profits from them. Each side moved for summary judgment. After hearing and argument, the district court granted judgment for the plaintiffs on Counts 1 and 4 and ordered the defendants to turn over rl.com. The plaintiffs voluntarily dismissed their other causes of action.

The district court saw the primary question before it as a choice of law: Virginia's or California's. Laxton, a California defendant, urged application of Virginia law. Mayberry, a Virginia plaintiff, wanted California law to govern. Under Virginia law, the defendants claimed, the plaintiffs had only a contract. Under California law, all parties agree, the plaintiffs' domain names were intangible personal property. The court conducted a government interest analysis, concluding California had the "greater interest" and giving judgment for the plaintiffs. On appeal, Laxton alleges this choice of California law was error.

## II. ANALYSIS

## A. Standard of Review

The parties are diverse. The amount in controversy exceeds $75,000, according to the plaintiffs' expert who estimates

rl.com to be worth $85,000. The judgment is final. Our review is de novo. *Lovell v. Chandler*, 303 F.3d 1039, 1052 (9th Cir. 2002).

## B. Choice of Law

**[1]** The parties dispute whether California or Virginia law applies in this case. When a federal court sits in diversity to hear state law claims, the conflicts laws of the forum state—here California—are used to determine which state's substantive law applies. *389 Orange Street Partners v. Arnold*, 179 F.3d 656, 661 (9th Cir. 1999). California applies the "governmental interest" analysis in choice-of-law questions. *Kearney v. Salomon Smith Barney, Inc.*, 137 P.3d 914, 922 (Cal. 2006). California has specifically rejected the alternative "place of the wrong" rule. *Reich v. Purcell*, 432 P.2d 727, 729 (Cal. 1967).

The government interest analysis consists of three steps:

> First, the court examines the substantive law of each jurisdiction to determine whether the laws differ as applied to the relevant transaction. Second, if the laws do differ, the court must determine whether a 'true conflict' exists in that each of the relevant jurisdictions has an interest in having its law applied. If only one jurisdiction has a legitimate interest in the application of its rule of decision, there is a 'false conflict' and the law of the interested jurisdiction is applied. On the other hand, if more than one jurisdiction has a legitimate interest, the court must move to the third stage of the analysis, which focuses on the 'comparative impairment' of the interested jurisdictions. At this stage, the court seeks to identify and apply the law of the state whose interest would be the more impaired if its law were not applied.

*Abogados v. AT&T, Inc.*, 223 F.3d 932, 934 (9th Cir. 2000) (citations and internal quotation marks omitted).

**[2]** As a default, the law of the forum state will be invoked, and the burden is with the proponent of foreign law to show that the foreign rule of decision will further the interests of that state. *See Hurtado v. Superior Court*, 522 P.2d 666, 670 (Cal. 1974). Thus, our first inquiry is to examine whether Virginia and California provide for different treatment of domain names.

**[3]** Like the majority of states to have addressed the issue, California law recognizes a property interest in domain names. As we explained in *Kremen v. Cohen*, domain names are intangible property subject to conversion claims. 337 F.3d 1024, 1030 (9th Cir. 2003). To this end, "courts generally hold that domain names are subject to the same laws as other types of intangible property." Jonathan D. Hart, *Internet Law* 120 (2008); *see, e.g.*, *Office Depot Inc. v. Zuccarini*, 596 F.3d 696, 701-02 (9th Cir. 2010) (domain name subject to receivership in the district of domain name registrar). We have previously explained the logic of California understanding domain names as intangible property because domain names are well-defined interests, exclusive to the owner, and are bought and sold, often for high values. *Kremen*, 337 F.3d 1024. Domain names are thus subject to conversion under California law, notwithstanding the common law tort law distinction between tangible and intangible property for conversion claims. *Id.*

**[4]** Laxton argues that a garnishment case from the Supreme Court of Virginia, *Network Solutions, Inc. v. Umbro International, Inc.* ("*Umbro*"), 529 S.E.2d 80 (Va. 2000), holds that domain names are contract rights under Virginia law. We find the case more equivocal. *Umbro* did treat domain names as contract rights, but at the same time, the opinion observed that the registrar of the name, Network Solutions, took the position that the name was "personal property." *Id.* at 85-86. The court stated that it did "not believe that it is essential to the outcome of this case to decide whether the circuit court correctly characterized a domain name as a 'form of intellectual property.' " *Id.* at 86. The

court, thus, did not disapprove of the characterization of domain names as property rights, but treated it as immaterial to the garnishment determination. *See id.* at 86-87; *see also* George Vona, Comment, *Sex in the Courts:* Kremen v. Cohen *and the Emergence of Property Rights in Domain Names*, 19 Intell. Prop. J. 393, 408 (2006) ("*Umbro* does not stand for the proposition that domain names are not intangible property. In fact, the decision is quite ambiguous.").

**[5]** *Umbro* tells us only about how Virginia law treats domain names in *garnishment* actions. Particularly given the majority of states' justifiable coalescence around understanding domain names as intangible property, we decline Laxton's invitation to read *Umbro* more broadly than its text requires.

**[6]** This understanding of *Umbro*'s holding as a narrow one is buttressed by the observation that California law, despite recognizing that domain names are intangible personal property subject to a common law action for conversion, *see Kremen*, 337 F.3d at 1024, does not authorize statutory turnover of domain names pursuant to the article governing judgment debtor examinations, *see Palacio Del Mar Homeowners Ass'n, Inc. v. McMahon*, 95 Cal. Rptr. 3d 445, 447 (Ct. App. 2009). The judgment debtor examination is more similar to garnishment than is conversion because of the statutory nature of the action and the posture in garnishment and turnover cases, where the parties are judgment creditors and debtors. In other words, there is no inherent inconsistency in understanding that Virginia might treat domain names differently in garnishment and conversion cases, because California finds reasons to make similar distinctions. Therefore, because *Umbro* does not compel the conclusion that Virginia considers domain names to be contract rights for purposes of *conversion* suits, we are not compelled to find that California law (under which domain names are property rights) and Virginia law are in conflict in this case.

On our narrow understanding of *Umbro*, California law applies. Under California choice-of-law rules, the party seek-

ing application of foreign law bears the burden to show that the law of a foreign state should apply. *See McGhee v. Arabian Am. Oil Co.*, 871 F.2d 1412, 1422 (9th Cir. 1989). At the point Laxton fails to make this showing, we default to forum (California) law.

Even if Laxton was correct in asserting Virginia treats domain names as contract rights for all purposes, however, at best his claim presents only a classic "false conflict." The district court accepted Laxton's reading of *Umbro*, concluding Virginia's treatment of domain names as contract rights in all instances reflected a policy of providing domain name purchasers "with a predictable limitation for their liability."

On appeal, Laxton argues this characterization of Virginia's interest was incorrect, again returning to the claim that *Umbro* demonstrates "Virginia's policy to control the characterizations of domain names that are acquired in that state" by Virginia citizens. Thus, whether under the district court's or Laxton's understanding of Virginia's interest, neither of which we are persuaded necessarily follows from *Umbro*, Virginia is concerned with protecting Virginia residents who purchase domain names *from* property claims, not *from asserting* property claims. Yet the defendant-purchaser, Laxton, is from California, not Virginia.[2]

Likewise, California's policy of treating domain names as intangible property rights offers no help to Laxton. In understanding domain names as intangible property subject to conversion, California seeks to protect the intangible property

---

[2]Laxton also argues rl.com is located in Virginia and thus any alleged tort occurred in Virginia as well. *Cf. Office Depot Inc.*, 596 F.3d at 702 (concluding that under California law, at least for the purpose of *quasi in rem* jurisdiction, domain names are located where the domain name registry is located). However, we decline to find the location of rl.com dispositive for the California choice-of-law analysis in this case, which is based on the government interests, not the place of the wrong. *See Reich*, 432 P.2d at 729 (rejecting the "law of the place of the wrong" rule).

rights of the owners of domain names, recognizing that control of a domain name "provide[s] a sense of identity and an exclusive vehicle to market products and ideas." *See* Patrick T. Clendenen et al., Domain Names as Property, *in* 1 *Internet Law and Practice* § 17:1, at 17-3 (2009). Many domain name registrants "invest substantial time and money to develop and promote websites that depend on their domain names. Ensuring that they reap the benefits of their investments reduces uncertainty and thus encourages investment in the first place, promoting the growth of the Internet overall." *Kremen*, 337 F.3d at 1030.

**[7]** California's policy in treating domain names as property is thus accurately characterized as protecting the rightful holders of domain names, encouraging investment in and development of that property. Such a policy would protect plaintiffs in suits alleging conversion of a domain name, not a defendant who allegedly converts a domain name. Further, "when the defendant is a resident of California and the tortious conduct . . . occurs [in California], California's deterrent policy of full compensation is clearly advanced by application of its own law." *Hurtado*, 522 P.2d at 672. California, therefore, has an interest in its law applying here, and Virginia does not.

**[8]** Thus, even if we accept Laxton's characterization of *Umbro*, which we do not, California law would apply because this would be a case of a false conflict, since Virginia does not have an interest in its law applying given how the parties are situated with Laxton as a defendant and Mayberry as a plaintiff. *See Ins. Co. of N. Am. v. Fed. Express Corp.*, 189 F.3d 914, 921 (9th Cir. 1999); *Tucci v. Club Mediterranee, S.A.*, 107 Cal. Rptr. 2d 401, 407 (Ct. App. 2001). Holding otherwise would encourage a race to the bottom, allowing purchasers of potentially disputed domain names, as well as cybersquatters, to reside or operate in states where intangible property is provided little or no protection from potentially tortious conversion. Such a situation could vitiate the intangi-

ble property rights of the true holders of such property not-withstanding states' well-intentioned efforts to protect these intellectual property interests.

## C. California Conversion Law

Having decided California law applies, we turn to whether Mayberry should have prevailed on summary judgment. Like the choice-of-law analysis, we must accommodate facts arising from Internet transactions within traditional legal doctrines.[3] We are faced with two parties, neither of which apparently knew anything they did was wrong until it was too late, and a third-party wrongdoer from whom it is unlikely anyone can ever collect judgment.

The parties do not dispute that a domain name is intangible property, subject to an action for conversion under California law. *Kremen*, 337 F.3d at 1030. Laxton argues, however, that his purchase of the domain name, done with no knowledge of its unsavory provenance, was not a wrongful act at all. Mayberry responds that Laxton's "innocence" is irrelevant since he continued to possess property over which he never did, or could have, possessed title.

### 1. Innocent Purchaser Defense

**[9]** Under California law, "[c]onversion is generally described as the wrongful exercise of dominion over the personal property of another." *Fremont Indem. Co. v. Fremont*

---

[3]Prosser, for example, once wrote, "The hand of history lies heavy upon the tort of conversion." William L. Prosser, *The Nature of Conversion*, 42 Cornell L.Q. 168, 169 (1957). Indeed, disputes structured like this one have proven vexatious for centuries. *See* Richard A. Epstein, *The Roman Law of Cyberconversion*, 2005 Mich. St. L. Rev. 103, 105-06 (describing "one of the most rudimentary challenges to any legal system," where B wrongfully acquires property to which A has the right, resells it to an unwitting buyer, C, and then flees the jurisdiction, leaving a legal dispute between A and C).

*Gen. Corp.*, 55 Cal. Rptr. 3d 621, 638 (Ct. App. 2007). The common law rule thus holds that so long as Laxton exercised conscious dominion and control over rl.com, he assumed the risk on the question of whether he is correct about the true title holder. *Poggi v. Scott*, 139 P. 815, 816 (Cal. 1914). Further, where a person entitled to possession demands it, the wrongful, unjustified withholding is actionable as conversion. *See* 5 Witkin Summary of Cal. Law *Torts*, § 712(2) (10th ed. 2005).

**[10]** California does, however, recognize an innocent purchaser defense. " 'As a general rule, an innocent purchaser for value and without actual or constructive notice that his or her vendor has secured the goods by a fraudulent purchase is not liable for conversion.' " *Express Media Group, LLC v. Express Corp.*, No. C 06-03504, 2007 WL 1394163, at *5 (N.D. Cal. May 10, 2007) (quoting Witkin, *supra*, at § 716 (Innocent Buyer)). The law distinguishes between a purchaser whose vendor obtained title by fraud and a purchaser whose vendor obtained title by theft, because an involuntary transfer results in a void title, whereas a voluntary transfer, even if fraudulent, renders the title merely voidable. *Id.* (citing Cal. Com. Code § 2403(1)); *see also State Farm Mut. Auto. Ins. Co. v. Dep't of Motor Vehicles*, 62 Cal. Rptr. 2d 178, 181 (Ct. App. 1997). Therefore, "an innocent purchaser for value and without notice, actual or constructive, that his vendor had secured the goods by a fraudulent purchase, is not liable for conversion." *Oakdale Vill. Group v. Fong*, 50 Cal. Rptr. 2d 810, 814 (Ct. App. 1996).

The district court found that Mayberry was "not lawfully dispossessed" of his right to rl.com "by Qiang's seizure of the domain name without Mayberry's authorization, and thus it was not possible for Defendants to acquire a right to the domain superior to Mayberry's by virtue of Laxton's purchase." Therefore, the court held, Laxton was "*prima facie* liable for conversion."

Laxton argues that Mayberry voluntarily parted with rl.com and, at most, the transfer to Qiang was obtained by fraud, leaving Laxton an innocent purchaser for value. In support of this argument Laxton offered his declaration, in which he claimed that "[t]here was nothing to suggest that this purchase [of rl.com] was anything other than an honest transaction. Prior to the purchase, I checked the domain name with the World Intellectual Property Organization just to make sure that there were no disputes involved with the domain name and there were none." He also offered an expert who explained inconsistencies in the evidence regarding the dates and circumstances surrounding Mayberry's loss of mat.net. Laxton's expert further explained that "CRS offers no explanation as to how Qiang might have transferred the registration away from Mayberry without his consent."

[11] The key determination was thus whether Mayberry lost control of rl.com as the result of theft or fraud. To be sure, if the title were voidable Mayberry could pursue a separate action against Qiang for the fraud, as could Laxton if the title were void. However, because of the likely inability of either party to collect a judgment against Qiang, the determination of the quality of the title is of paramount importance. In any case, the facts underlying a determination on this issue are contested. Laxton alleges facts that, if credited, support the conclusion that Mayberry voluntarily gave up control over rl.com, and Qiang exploited that carelessness to fraudulently obtain control of the site. Yet the district court begged the factual question in characterizing Qiang's control of rl.com as a "seizure" when the circumstances of the transfer are unclear. We thus remand to the district court for further fact-finding to resolve Laxton's claims that Mayberry lost rl.com due to fraud.

### 2. Abandonment

At the district court, Laxton also claimed Mayberry's actions resulted in Mayberry's abandonment of his right to

possess rl.com. The district court rejected this argument, holding that "a defendant must show a 'clear, unequivocal, and decisive act' demonstrating a waiver of the plaintiff's property rights." *See Hopson v. Nat'l Union of Marine Cooks & Stewards*, 253 P.2d 733, 735 (Cal. 1953). The district court concluded that Laxton "point[ed] to no such affirmative relinquishment of Mayberry's right to exercise control over rl.com."

**[12]** While this court correctly states the standard of abandonment under California law, in *Ananda Church of Self-Realization v. Massachusetts Bay Ins. Co.*, a California appellate court upheld an abandonment defense to a conversion action where the plaintiff had discarded documents in an outdoor trash barrel, reasoning that " '[a] thing is abandoned when the owner throws it away, or leaves it without custody, because he no longer wishes to account it as his property.' " 116 Cal. Rptr. 2d 370, 377 (Ct. App. 2002) (quoting William T. Brantly, *Of the Law of Personal Property* § 133, at 213-14 (1891)). Laxton claims the facts are similar as Mayberry gave up mat.net to a public database—essentially a virtual trash bin—listing websites available to the public for registration.

The district court noted that it could "divine no intent to abandon rl.com from Mayberry's failure to update his contact information with [Network Solutions] once he lost access to the email address, dale@mat.net. It is not clear when Mayberry first learned that he no longer could access his email, and only four days passed between mat.net's transfer to Qiang and the theft of rl.com. In any event, Mayberry's failure to change the contact information . . . cannot be interpreted as an affirmative abandonment of his rights to the domain." We are not so sure.

**[13]** The factual disputes regarding the loss of mat.net prevent disposing of this case on summary judgment. Laxton did allege an act that, he says, is unequivocal and indicates decisive intent to abandon rl.com: the abandonment of mat.net.

Laxton claims Mayberry abandoned mat.net, letting its registration expire, and based on Mayberry's extensive knowledge of the system for registering domain names, this was also an abandonment of rl.com. Mayberry disputed the facts underlying his intent. The record, in the district court's words, is "not clear" on the facts surrounding Mayberry's loss of mat.net. These "not clear" facts are material as to Mayberry's intent regarding rl.com. *See Trevaskis v. Peard*, 44 P. 246, 248 (Cal. 1893) ("Abandonment, it is true, is a matter of intent; but that intent may be proved by the acts and conduct of a party, even against his express declarations to the contrary."). Further factual development is therefore necessary regarding the precise circumstances through which Mayberry lost control of mat.net and thus rl.com.

Finally, we note that the issue of "fraud" versus "theft," as well as the claim that Mayberry abandoned rl.com, both relate to the circumstances under which Mayberry lost control over rl.com. The issues heighten our concern that—accepting Laxton's account of the facts, as we must at summary judgment—the record shows Mayberry could have maintained his control over mat.net and rl.com with as little as a single e-mail and a few clicks on a webpage. Laxton, on the other hand, who claims he searched for pending disputes over rl.com, may not have been able to ascertain the not-yet-realized dispute with any amount of diligence. *See Oakdale Vill. Group*, 50 Cal. Rptr. 2d at 814; *see also* Epstein, *supra*, at 106-07. Further, though the record—again—is not perfectly clear, it appears that Mayberry had lost control over rl.com more than eighteen months before Laxton purchased the domain name, during which time Mayberry apparently took no action despite having previously demonstrated his knowledge of the need to change administrative contacts for his websites, as well as his proven ability to do so.

**[14]** In short, we cannot decide the issue of whether Qiang obtained rl.com by "theft" on the "not entirely clear" record before us. Under the circumstances alleged by Laxton, it is

unclear whether "theft" or "fraud" is the appropriate understanding of the method through which Mayberry lost control of mat.net and rl.com. *See People v. Moses*, 266 Cal. Rptr. 538, 541 n.7 (Ct. App. 1990) (theft arises only if finder has requisite notice regarding owner's identity). Further, it is not entirely clear if Mayberry "lost" or "abandoned" the website. In so holding we do not determine one way or the other whether Mayberry abandoned rl.com. It may be that Mayberry's loss was indeed "theft," but this will be an issue for the district court to determine on remand with the benefit of further fact-finding.

## III. CONCLUSION

**[15]** For the aforementioned reasons, we affirm the district court's decision to apply California law but reverse the grant of summary judgment, concluding Laxton raised contested issues of material fact. We therefore remand for further proceedings consistent with this Opinion.

**AFFIRMED in part**, **REVERSED in part**, **and REMANDED.** Each party to bear its own costs of appeal.

---

NOONAN, Circuit Judge, dissenting:

I agree that California law governs and that the primary question is whether possession of the domain name rl.com was acquired by theft or fraud. A secondary question is its alleged abandonment.

Undisputed facts established that Mayberry held the domain name rl.com registered through July 25, 2005. Undisputed facts established that Li Qiang transferred the domain name to himself before the registration to Mayberry had expired. No facts were presented to the court showing or even

suggesting that Li Qiang had obtained the domain name by fraud rather than by theft.

The majority notes that Laxton checked the registry and found nothing suspicious. That fact establishes his innocence and good faith; it does not establish that Li Qiang had gotten hold of the domain name by fraud. Laxton was in the position of any innocent purchaser of stolen property. He had to return the property to the owner.

No reason exists to remand to the district court to find facts when the relevant facts were undisputed. The *only* factual challenge made by Laxton on this appeal is his assertion that the transfer to Li Qiang "was not tortious." *Brief for Appellant*, p. 20. This assertion of nontortiousness is unsupported by citation to the record. It does not put at issue the district court's conclusion that Li Qiang acquired the name by theft rather than by fraud. It is insufficient to create a factual dispute now needing resolution. On no page of his appeal does Laxton assert that he was an innocent purchaser for value of property fraudulently acquired by Li Qiang. The district court was correct when it found:

> Defendants have not pointed to any evidence that Mayberry voluntarily transferred the title of rl.com to Qiang as a result of fraud. To the contrary, all of the evidence suggests otherwise.

The majority draws from the record the possibility that Mayberry deliberately abandoned mat.net by leaving it to a "virtual trash bin" of available domain names. There is no evidence that Mayberry abandoned rl.com in this way. The majority guesses that the abandonment of mat.net might have been the abandonment of both domain names. Its guess is without foundation. It is as though Mayberry had thrown away a bank statement that had on it the numbers and codes necessary to access a bank account. He surely would have

meant to abandon the statement. It could not be reasonably inferred that he meant to abandon the account itself.