Filed 6/3/14  P .v. Jones CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D063156 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD236277) |
| KEWAN TOMOY JONES et al., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Joan P. Weber, Judge.  Affirmed.

Thomas E. Robertson, under appointment by the Court of Appeal, for Defendant and Appellant Dejon Tamani Joy.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Meagan Beale and Raquel M. Gonzalez, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant Dejon Joy of two counts of first degree robbery (Pen. Code, §§ 211/212.5, subd. (a))[1] and found true the allegation Joy personally used a firearm in committing those offenses (§ 12022.5, subd. (a), 12022.53, subd. (b).) In posttrial proceedings, Joy and his codefendant Kewan Jones moved for an order to release the personal identifying information for all of the jurors and/or for a "*Hedgecock* hearing"[2] to allow the defense to investigate alleged juror misconduct as a predicate for a possible motion for a new trial based on jury misconduct. The court denied the motion, and sentenced Joy to 18 years 8 months in prison. On appeal, Joy argues the denial of the motion to release the jurors' personal identifying information was an abuse of discretion.

I

FACTS

A. Prosecution Evidence

On the evening of August 24, 2011, Mr. Patton invited Jones to come to Patton's house to smoke marijuana. Three men in a silver vehicle arrived at Patton's home, but one of the men remained outside while Jones, accompanied by Joy, went to the front door of Patton's home and were invited inside. Patton had never seen Joy before. After the vehicle arrived, the third man got out of the backseat, walked around the front, and got into the driver's seat.

---

[1]     All further statutory references are to the Penal Code unless otherwise specified.

[2]     A *Hedgecock* hearing refers to an evidentiary hearing in which jurors may be compelled to testify to "resolve factual issues presented by a new trial motion based on allegations of juror misconduct." (*People v. Hedgecock* (1990) 51 Cal.3d 395, 414.)

Patton, accompanied by Joy, went to the kitchen to retrieve some marijuana. As Patton reached into a drawer, Joy grabbed him around the neck and pointed a .38 caliber gun at his head. Joy then forced Patton to squat down on one knee, ordered him to remove his ring, and took the ring.

Patton's wife (Linda) heard her husband moan and walked into the kitchen, where she saw Joy holding a gun to Patton's head. She tried to leave the kitchen but Jones grabbed her, took her into the bedroom, and began rummaging through everything. Jones took money from Patton's dresser drawer and then pushed Linda into the bathroom and closed the door. Patton was detained at gunpoint in the kitchen for about five minutes while Jones and Linda were in the bedroom, but Patton could overhear the conversation between Jones and Linda, including a demand by Jones that Linda show him where the money was kept or he would go into the kitchen and shoot Patton.

Joy told Jones to take the Pattons' cell phones, which Jones placed into a duffel bag. Joy "marched" Patton into the bathroom where Jones had put Linda. Joy or Jones then closed the door and Joy warned them not to come out. When Patton heard the front door slam, he ran out of the bathroom and searched for his keys so he could pursue Joy and Jones. Linda used her house phone to call police and, as she was on the phone, saw the silver vehicle leave the parking area. As Patton went downstairs, the silver vehicle

3

left the parking area and headed north. Patton got in his car and tried to follow it but was detained by police, who asked him questions and searched his car.[3]

San Diego Police Officer Woodland was close to the Patton's home when he was dispatched to the scene in response to Linda's 911 call. He spotted a vehicle matching the description of the suspects' vehicle (a "long gray car with three black males in black clothing") near the Patton's home and turned his spotlight on the vehicle. He saw three black males, including Jones, inside the vehicle. The vehicle kept going and Woodland called for back-up as he continued following it. When back-up arrived, Woodland activated his siren and lights but the vehicle accelerated away, driving up to 85 m.p.h. through the college area, and then going onto Interstate 8 eastbound. Woodland followed the vehicle, which exited the freeway at Second Street in El Cajon, ran a stop light, headed east on Peach Street and then turned left onto Grape Street. Woodland lost sight of the vehicle for less than a minute but then located it at a duplex on Peach. The vehicle's engine was on but it was unoccupied. A witness showed Woodland the house into which the vehicle's occupants had fled.

Police established a perimeter around the duplex and, after several hours, called everyone out of the residence. Joy, Jones, and several other people (including a Mr. Pittman) came outside. Police searched the duplex and found two large wads of cash

---

3     Patton originally told police Jones had appeared at his home and asked to use the phone because Jones was lost. Patton explained he lied to police because he had an ounce of marijuana on his television he feared police would see, and also had another small quantity in the kitchen. Patton testified he was promised immunity for his conduct in giving marijuana to someone.

secured by rubber bands, including a roll containing $1800.[4]  Police also found a backpack that contained live .38 caliber ammunition and a replica gun that shoots BB pellets but looks like a firearm.  The lab analysis of the replica gun did not produce either fingerprints or DNA matching Joy or Jones.  Police also found Linda's cell phone.  In or around the vehicle Woodland followed, police found other items taken from the Pattons.

The following day, a girl found a loaded .38 revolver in a front yard near the duplex at which Joy was arrested.  DNA testing showed three males contributed DNA to the gun, and that Mr. Pittman was the major donor of the DNA but the amount of the DNA was insufficient to allow a comparison of Joy's or Jones's DNA to the other contributors on the gun.  Police eliminated Mr. Pittman as a suspect.

Joy and Jones were arrested that night.  Joy received and waived his *Miranda*[5] rights and told police he played with his son earlier that day but "then he blacked out and he remembered nothing else of the entire evening."  Jones also received and waived his *Miranda* rights and told police he played at a softball game for a team called "the Rack" at a park in El Cajon, and the game lasted until around 9:00 or 10:00 p.m.  Later that night, his mother drove him and Joy around, and then he went to his friend's house on Peach.  Jones denied he was in the suspect vehicle that night.

---

4       Patton testified that Joy and Jones had taken $1500 in cash from under a table in his living room and another $1800 in cash that had been in a bedroom drawer.

5       *Miranda v. Arizona* (1966) 384 U.S. 436.

B. <u>Defense Evidence</u>

Jones testified that, on the evening of the incident, he had played in a softball game.[6]  While there, he received a phone call from Patton indicating Patton had marijuana for sale, so Jones collected money from his teammates.  Later that night, he met with Joy, who drove them to Patton's house.  There was no third person in the car.

When they arrived, Patton showed them a sample of the marijuana in the kitchen.  Jones decided not to buy the marijuana and, as they were bundling up their money to leave, Patton invited them to see a larger bundle of marijuana in the living room.  Patton grabbed Jones's arm, and Joy reacted by pushing Patton down.  Linda stood up from her desk and Patton told her to get a gun.  Jones quickly grabbed his bag, scale, money, and what he thought was his cell phone, and he and Joy fled.

Jones and Joy left, with Joy driving, but encountered a patrol car, which followed them for some distance before activating its lights and siren.  Jones told Joy to drive to the duplex on Peach, where he hid the money.

Joy also testified that he was at the softball game in which Jones played that night but left before the game ended.  Jones later showed up at Joy's house and Joy offered to drive them to Patton's house.  There, Jones declined to buy the marijuana based on its appearance, angering Patton, who claimed he had bought it for Jones.  When Patton grabbed Jones, Joy pushed Patton to the floor.  Jones was angry at Joy for pushing Patton,

---

[6]     Police checked with the El Cajon Parks and Recreation Department for the team roster for the Rack team's game that night, and Jones's name did not appear on the roster where the players signed in.  However, Jones claimed the entry "T.J." represented his name.

6

and they were arguing outside when Patton appeared at the railing and said he was calling the police. Joy did not own a weapon and did not possess a firearm that night.

II

ANALYSIS

Joy asserts the trial court abused its discretion when it denied a joint defense request for the release of confidential juror information to allow the defense to investigate and develop evidence to support a motion for new trial based on jury misconduct.

A. Background

The trial evidence included (1) the Pattons' testimony there was a third male in the silver vehicle when it arrived at their house that night, (2) a tape of Linda's 911 call telling police she had been robbed by three men, and (3) Woodland's testimony that the car he spotted and followed to the Peach Street duplex carried Jones and two other men. This evidence contradicted Joy's version that only he and Jones went to the Pattons' house that evening.

Additionally, there was DNA evidence that three males were contributors to the DNA found on the .38 caliber gun found in the yard next door to the Peach Street duplex, and that Mr. Pittman was the "major contributor." However, Detective Wolfe testified on cross-examination that, despite this DNA evidence, Pittman was excluded as a suspect, although the detective then clarified Pittman was not "completely excluded [as a suspect but] I didn't have any evidence really pointing to him as [being] one of the suspects or being an additional suspect." When questioned by the district attorney on redirect about having eliminated Mr. Pittman as a suspect, the district attorney asked "you didn't have

7

anything to tie him to this event?" and the detective responded, "Correct. I didn't have any . . . sort of evidence that would compel me to pursue charges against him."

After trial, the court's staff found a spreadsheet in the jury deliberations room. This three-page computer document contained notes about the evidence presented at trial on various issues, along with the juror-author's impressions, and in one of the columns (entitled "Notes-Questions") was the entry, "DA stated that there wasn't enough evidence against the 3rd person to press charges."

This document formed the basis for Joy's motion seeking an order to release confidential juror identifying information (pursuant to Code Civ. Proc., §§ 206 & 237) or, alternatively, to order a *Hedgecock* hearing at which the jurors could be questioned, to allow the defense to develop information for a new trial motion based on potential juror misconduct.[7] The prosecution opposed the motion, arguing, in part, that the spreadsheet contained "no outside information that [the juror-author] had in that document that a juror wouldn't have known by sitting in this courtroom." At a hearing on the defense motion, the court found the document was prima facie evidence that the juror-author had taken his or her notes out of the jury room, but there was insufficient evidence of misconduct to

---

[7] One specification of misconduct was that CALCRIM No. 101 instructs jurors to keep electronic devices turned off while in the courtroom and during deliberations, and this computer printout suggested a potential violation of that admonition. However, Joy cites nothing suggesting this instruction was given to the jury, and our independent examination of the jury instructions indicates CALCRIM No. 101 was not given here. Because Joy on appeal does not resurrect this claim of misconduct, we need not further discuss it.

order a *Hedgecock* hearing. However, the court agreed to contact all jurors to determine if any juror would object to providing identifying information to the lawyers.

At the next hearing, the court advised that nine jurors had objected, but that personal information would be provided for three jurors, one of whom was the foreperson. The court continued the hearing to December 14, 2012, to allow time for the defense to contact the jurors to determine what information might be obtained. Before the December 14 hearing, Jones's counsel moved for a continuance, explaining that she had contacted the three jurors and each had denied seeing or learning about the spreadsheet, but that it would be necessary to contact the nine remaining jurors to determine the relevance of the spreadsheet as it related to a motion for new trial. Joy's counsel joined in renewing the motion to release the identifications of the other nine jurors, arguing she had spoken with the three jurors and "based upon our discussions with the jurors, other potential grounds for new trial have arisen."

At the December 14 hearing, the court first confirmed counsel had interviewed the three jurors and all three said they had not seen the spreadsheet or known about it. The court also observed it was not concerned about the *contents* of the spreadsheet because it was based on the evidence presented at trial and did not appear to contain anything that resulted from an investigation done outside of court in violation of the court's instructions. Neither defense counsel contested that finding. Instead, the court's only concern had been how it got "printed out," but the court recognized it would not be misconduct if the juror-author merely printed his notes out at home and brought them in "just like he'd have in a notebook if he had written it out." Since there was no evidence

9

of either impropriety or that the spreadsheet had been discussed, there was insufficient grounds to launch a "fishing expedition" into whether or not there had been any jury misconduct.

B. <u>Legal Framework</u>

A defendant may petition for access to confidential juror identifying information (pursuant to Code Civ. Proc., §§ 206 & 237) for purpose of developing evidence to support a motion for new trial based on alleged jury misconduct. (*People v. Carrasco* (2008) 163 Cal.App.4th 978, 989 (*Carrasco*).) Disclosure is warranted when the defendant provides (1) a sufficient showing to support a reasonable belief that jury misconduct occurred, (2) diligent efforts were made to contact the jurors through other means, and (3) further investigation is necessary to provide the court with adequate information to rule on a motion for new trial. (*Id*. at p. 990.) "In reviewing the trial court's ruling regarding a claim of juror misconduct, we accept the trial court's findings of historical fact if supported by substantial evidence" (*People v. Thomas* (2012) 53 Cal.4th 771, 819), and we may reverse the court's ruling on the motion only if we determine the ruling was an abuse of discretion.[8] (*Carrasco, supra,* 163 Cal.App.4h at p. 991.)

---

[8] Joy alternatively sought a "*Hedgecock* hearing" in which the jurors could have been questioned about the alleged misconduct as a predicate for a potential new trial motion. We recognize our Supreme Court is currently considering whether a court, when faced with a new trial motion based on alleged juror misconduct where there is evidence suggesting (but not conclusively establishing) juror misconduct, *must* conduct a *Hedgecock* hearing before it may reach the merits of that new trial motion. (See *People v. Lavender,* review granted June 10, 2013, S209975.) Joy has not raised this issue here, and we therefore do not further evaluate whether the trial court erred by preemptively denying Joy's incipient new trial motion without first conducting a *Hedgecock* hearing.

10

C. <u>Analysis</u>

Joy argues the ruling was an abuse of discretion because the notation--"DA stated that there wasn't enough evidence against the 3rd person to press charges"--was evidence that supported a reasonable belief jury misconduct occurred.  Joy notes a juror's receipt of extrinsic information bearing on the case (even if unintentional) is misconduct (*People v. Nesler* (1997) 16 Cal.4th 561, 578-579), and the notation supports a reasonable belief that the juror-author received outside information because the record contains no such statement from the prosecutor, from which an inference could be drawn that the juror-author "overheard the prosecutor talking in a hallway or restroom."

Even assuming Joy may raise this argument on appeal,[9] the trial court observed it was not concerned about the contents of the spreadsheet because it found the notations were based on the evidence presented at trial and contained nothing not premised on the evidence, and neither defense counsel contested that finding.  There is some evidence

---

[9]     At trial, neither defendant claimed the statement in the spreadsheet could be construed to reflect that the juror-author may have inadvertently overheard the prosecutor talking in a hallway or restroom, even though the prosecutor would have been readily available to testify to confirm or deny whether he ever made such a statement in or around the courthouse.  Under these circumstances we question whether the claim may be asserted for the first time on appeal.  (See *People v. Moses* (1990) 217 Cal.App.3d 1245, 1252 [" 'It is elementary that a new theory cannot be raised on appeal where, as here, the theory contemplates factual situations the consequences of which are open to controversy and were not put in issue in the lower court.' "]; accord, *People v. Clark* (2011) 52 Cal.4th 856, 889, fn. 7 [claims are forfeited unless it required no action below by the party proposing it or " 'the new arguments do not invoke facts or legal standards different from those the trial court itself was asked to apply' "]; *People v. Williams* (2008) 43 Cal.4th 584, 624-625 [party forfeits a claim where he asks a reviewing court to interpret and apply the law to the facts despite "the circumstance that there is a critical factual dispute that the trial court never was asked to explore or resolve"].)

11

supporting this finding. During cross-examination, the district attorney stated, in the form of a leading question, that "you said that you didn't have anything to tie [Pittman] to this event?" and the detective responded "Correct." A trial court, sitting as trier of fact, could infer the short-hand notation by the juror-author--that "DA stated that there wasn't enough evidence against the 3rd person to press charges"--was a recap of this testimony, either because "DA" referred to the detective, or because the district attorney's statement that police "didn't have anything to tie [Pittman] to this event" was adopted by the detective's response, "Correct." Under either construction, there was sufficient evidence to support the trial court's conclusion that the juror-author's notation was based on the evidence admitted at trial. Therefore, the trial court's ruling denying Joy's request to disclose confidential juror identification, based on its determination Joy had not made a sufficient showing to support a reasonable belief that jury misconduct occurred (*Carrasco, supra*, 163 Cal.App.4th at p. 990), was not an abuse of discretion.

DISPOSITION

The judgment is affirmed.


McDONALD, J.

WE CONCUR:


HUFFMAN, Acting P. J.


O'ROURKE, J.

12